OPINION
{¶ 1} Defendant-appellant, Teray D. Marshall, Jr., appeals his conviction for felonious assault with a firearm specification following a jury trial in the Butler County Court of Common Pleas.
 {¶ 2} Appellant was indicted in November 2007 on one count of felonious assault with two firearm specifications (brandishing a firearm and possessing an *Page 2 
 Butler CA2008-03-093 automatic firearm) for his role in a shootout that occurred in a Middletown, Ohio housing complex ("the projects," as referred to in the testimony of several witnesses) near Main and Lafayette Streets. The state alleged that in the early morning hours of September 19, 2007, appellant, along with Gabriel Tyrone Smith, Shadeed Barnett, and Terry Fuller, opened fire in the projects, riddling the neighborhood with bullets and injuring several people, including Demarco Conley (shot in the stomach), Jeremy McGuire (shot in the hand), Jerrel Wright, and Deontae Robinson (both shot in the leg). Demarco underwent numerous surgeries for his gunshot wound to the stomach and was still hospitalized at the time of the trial.
 {¶ 3} On February 11-15, 2008, appellant was jointly tried with Gabriel Tyrone Smith, Shadeed Barnett, and Terry Fuller. Appellant did not testify or present evidence on his behalf. Due to his serious, life-threatening injuries, Demarco was unable to physically testify at trial; a videotaped deposition of his testimony was instead played to the jury. Testimony at trial revealed the following facts:
 {¶ 4} In the early morning hours of September 19, 2007, Demarco was at a bar with his girlfriend, Lori Glover, and his best friend, Jeremy McGuire. According to Demarco, present at the bar were appellant, Gabriel Tyrone Smith ("Tyrone"), and Terry Fuller. Lori and Jeremy saw Tyrone and Terry at the bar but did not see appellant or Shadeed Barnett (or were not sure if they were there). Terry was wearing orange. While at the bar, Demarco got into a fight with Brandon Smiley, a friend of appellant. After the fight, Lori drove to the projects with Demarco and Jeremy and dropped them off. It was Demarco's intention to recruit friends to go finish the fight with Brandon.
 {¶ 5} An aerial view of the projects shows that it is comprised of three parallel *Page 3 
streets: Cribbs Street to the north, Weaver Street to the south, and McGuire Street between the two; running perpendicular to these streets are Main Street to the east, and Vance Street to the west. Of importance to the case is a grassy area that is a joint backyard for apartment buildings on McGuire and Weaver Streets.
 {¶ 6} At the projects, Demarco and Jeremy met up with Demetrius Davis (Lori's brother), James Wilson, Jerrel Wright (Demarco's cousin), and Zeph Jennings. Demetrius and Zeph lived on Weaver Street, Jerrel on McGuire Street. As the group was getting together, Demetrius, James, Jeremy, and Zeph noticed a blue Ford Taurus with dark tinted windows on Weaver Street driving around the projects. Jeremy and Zeph did not see who was driving the Taurus. By contrast, Demetrius and James both testified that Tyrone was driving the Taurus. James further testified that his sister, Cierra Wilson, was a passenger in the Taurus. Cierra testified Tyrone was driving the Taurus in which she was a passenger.
 {¶ 7} After dropping off Demarco and Jeremy, and as she was driving south on Main Street, Lori noticed that Tyrone was following her in a blue Taurus. Lori eventually pulled over and the two briefly conversed from their cars. Lori did not see anybody else in the Taurus. During their conversation, Tyrone received a phone call. Tyrone told the caller "that's all you got to say. I'm on my way," then left and drove away towards the projects. Lori does not know who the caller was.
 {¶ 8} Meanwhile, in the projects, Demarco and his friends were on McGuire Street where they ran into D'Angela (James' cousin) who was crying because her boyfriend, Deontae Robinson, had beaten her up. Upon seeing Deontae walking down the street, James, along with Jeremy and Demarco, beat up Deontae. Either during the *Page 4 
beating or immediately after, Demetrius observed a silver Nissan vehicle drive on McGuire Street before turning on Vance Street.[1] In the Nissan vehicle were appellant, Shadeed, and a third person wearing an orange shirt. Shadeed was driving the car; appellant was in the front passenger seat.
 {¶ 9} Soon after, gunfire erupted. Both Demetrius and James testified that appellant came around the corner from Vance Street and started shooting while walking down McGuire Street. Jerrel testified that the shooting started on McGuire Street near Vance Street; it then was coming from everywhere. By the look or the way it was shooting rapidly, Demetrius and James believed appellant was using an automatic weapon. By the sound of the gunfire, Jerrel believed automatic weapons were used. Before the shooting started, James heard appellant say "I see you all bitch ass n***s." Zeph similarly heard someone scream out of a car "I see you all n***s." Demarco heard someone yelling "there they go," followed by a "bunch" of automatic gunfire. Demarco did not know who started the gunfire, or where or why it started.
 {¶ 10} As gunfire erupted, Demarco and his friends scattered and took off running. Demetrius took off running towards Main Street with the intention to retreat into the woods to the east of Main Street. He was in the grassy area between McGuire and Weaver Streets when he saw the Taurus come around; the front passenger window rolled down; shots were fired from the car. Demetrius retreated and hid behind a shed until he heard the Taurus leave. He then ran across Main Street to safety. Shooting was still going on after he had crossed Main Street. Demetrius observed the Taurus *Page 5 
driving south on Main Street.
 {¶ 11} Zeph took off running through the grassy area towards Main Street. However, the Taurus came around and shots were fired from the car. Zeph retreated; as he was running away from Main Street, he saw Demarco. At that moment, someone in orange started shooting at Zeph who retreated to safety into a house.
 {¶ 12} Jeremy was shot in his hand before he took off running. He does not know who shot him. After being shot, Jeremy took off running through the grassy area, ran across Main Street diagonally, and fell behind bushes.
 {¶ 13} Demarco took off running and hid behind a shed in the grassy area near Main Street. Gunfire and yelling continued. As he was hiding, he saw Jeremy, his best friend, being chased and fired at by two people. Demarco believed the two shooters were appellant and Shadeed. Jeremy was sprinting towards Main Street. Although the two shooters had already run past him, Demarco came out of hiding and yelled to distract them. The shooters turned towards him and started shooting. Demarco was shot in the stomach in the grassy area near Main Street and fell to the ground. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized appellant's voice. Another individual with appellant told appellant "to come on because the police was coming." Demarco did not know if the second voice was Shadeed's voice. Demarco testified that at that point he was in and out of consciousness. This was confirmed by Officer Ken Minear who testified Demarco was unable to communicate as he was in and out of consciousness. Demarco testified that during the shootout "there was a lot of automatics going off;" more than two shooters were involved as there was too much gunfire to come solely *Page 6 
from appellant and Shadeed.
 {¶ 14} Jerrel took off running through the grassy area when he saw his cousin Demarco fall. Jerrel started running towards Demarco when someone came around shooting. Jerrel retreated and was running back to his house when he was shot in the leg. Jerrel did not see who shot him and could not identify any of the shooters; all he "saw" were bullets.
 {¶ 15} James took off running as soon as appellant started shooting, and retreated to the grassy area where he ended up near Jerrel. At the beginning of the shootout, James also observed shots fired from the Taurus; at that time, the Taurus was on Main Street between McGuire and Weaver Streets. While he was in the grassy area, James observed Demarco get shot in that same grassy area near Main Street, fall to the ground, and being subsequently hit with a weapon by appellant. Shadeed, who was then with appellant, told appellant: "Here come the police. Come on." Thereafter, Jerrel was shot by a shooter wearing an orange shirt. James was with him. After being shot, Jerrel pushed James into an apartment building. James does not know who shot Demarco.
 {¶ 16} Holly Cummings, a resident on McGuire Street, was playing cards that morning when she heard gunfire and people yelling. Looking out her back window into the grassy area, she observed a man with a big weapon walking through the grassy area towards Main Street. The weapon was not a handgun. The man was not firing the weapon but was holding it up in sight.
 {¶ 17} Lori Griff is, a resident on Weaver Street, was awakened by the shootout. Looking out her front door, she observed a blue Ford Taurus with dark tinted windows *Page 7 
on Weaver Street with the back passenger door open. The Taurus was facing the west. Griffis heard two men arguing somewhere in the area, with one saying "You're going to do me like that n***;" shots were then fired from the Taurus through the open door into the grassy area. The Taurus then drove "real fast" past her house to the end of the street, drove back to its original location in reverse, and finally drove back past her house and turned onto Vance Street. Griffis never saw anyone exit the Taurus. Griffis testified that when the Taurus drove in reverse, she could hear gunfire coming from the grassy area; in fact, a couple of bullets hit her storage shed located in the grassy area.
 {¶ 18} A police officer trained in weapons as a SWAT team member was on light duty that morning taking 911 calls. The officer testified that they received over 30 calls regarding the shootout and that while talking to callers, he could hear gunfire, both automatic and semi-automatic.
 {¶ 19} At the scene, the police recovered 26 shell casings from three different calibers, to wit: seven 9 mm shell casings at the corner of Weaver and Main Streets; five .40 caliber shell casings in the grassy area near Vance Street; and 14 7.62x39 shell casings in the grassy area and at the corner of Weaver and Main Streets. The recovered shell casings all appeared to be "fresh" casings. No shell casings were found at the corner of Vance and McGuire Streets. Several bullet strikes and/or holes were found on the ground, telephone poles, and buildings, including inside a residence on McGuire Street. The crime scene covered three blocks. The weapons used in the shootout were never recovered.
 {¶ 20} The silver Nissan vehicle was recovered that day; it was parked on Vance Street and was rented to Shadeed. Although searched, nothing was recovered from the *Page 8 
vehicle. The Taurus was found later that day on 17th Avenue. There was no damage to the body of the car or the windows. There were no shell casings in the car; "the interior was very clean." The Taurus was not processed for gun powder residue; a detective testified powder residue tests are no longer considered reliable. A bullet was found lodged inside the top of a rear passenger door of the Taurus. Detective David Swartzel testified the bullet appeared to have been fired from the Taurus (and not at the Taurus).
 {¶ 21} Appellant and Tyrone turned themselves in. Shadeed was arrested the day after the shootout. A search of his apartment yielded one .40 caliber bullet, two bullet proof vest carriers without their panels but each with a holster of a different size, and Shadeed's passport. Neither the holsters nor Shadeed were checked for gun powder residue.
 {¶ 22} Chris Monturo of the Miami Valley Regional Crime Laboratory testified he examined the 26 shell casings recovered from the crime scene. According to Monturo, at least four weapons were involved in the shootout: three semi-automatic or automatic weapons and possibly one revolver. The .40 caliber shell casings all came from one gun; as did the 9 mm shell casings. Monturo testified a TEC-9 weapon uses 9 mm bullets. With regard to the 7.62x39 shell casings, Monturo testified two types of semiautomatic weapons can use those shells: AK-47 and SKS weapons; both weapons can be converted into automatic weapons; however, he could not tell whether the shell casings came from the same weapon. Monturo also could not tell whether the weapons used were semi-automatic or automatic weapons.
 {¶ 23} Monturo further testified that a bullet recovered from inside a residence on *Page 9 
McGuire Street was fired from an AK-47, AKS, or SKS semi-automatic weapon; a bullet recovered in the grassy area was fired from a Beretta Smith-Wesson or a Springfield XD semi-automatic pistol; and the bullet recovered in the Taurus was fired from a revolver.
 {¶ 24} On February 15, 2008, the jury found appellant guilty of felonious assault with one firearm specification (brandishing a firearm). Appellant was subsequently sentenced to 11 years in prison. He now appeals, raising two assignments of error.
 {¶ 25} Assignment of Error No. 1:
 {¶ 26} "THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 27} Appellant argues that in light of the fact that the state's witnesses were biased, unreliable, and contradictory, the jury clearly lost its way when it convicted him of felonious assault. According to appellant, "[n]ot a single person could explain [appellant's] motive for engaging in a firefight in retaliation for a bar fight that he wasn't present for. No witness testified to any connection between [appellant] and any participant or victim of either the bar fight or [the beating of Deontae]." We disagree.
 {¶ 28} In order for a court of appeals to reverse a jury verdict on the basis it is against the manifest weight of the evidence, the appellate court must unanimously disagree with the trier of fact's resolution of any conflicting testimony. State v. Thompkins,78 Ohio St.3d 380, 389, 1997-Ohio-52. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should *Page 10 
be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. When reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 29} Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(2), which states: "No person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." The jury further found appellant "did have, or aided or abetted another who had a firearm on or about his person or control and either displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm or used it to facilitate the offense." See R.C. 2941.145(A).
 {¶ 30} In the early morning hours of September 19, 2007, Demarco was involved in a fight at the bar with a friend of appellant. According to Demarco, appellant was at the bar. After the fight, Demarco drove to the projects to recruit friends to go finish the bar fight. At the project, either during or right after the beating of Deontae, Demetrius observed a Nissan vehicle driven by Shadeed drive on McGuire Street before turning on Vance Street. Appellant was in the front passenger seat. Neither James nor Jerrel saw the vehicle as they were either involved in or watching the beating. The car was recovered later that day on Vance Street.
 {¶ 31} Soon after the Nissan vehicle turned on Vance Street, Demetrius and James saw appellant come around the corner from Vance Street and walk down McGuire Street. Both observed appellant shooting; both believed appellant was using *Page 11 
an automatic weapon. Jerrel testified the shooting started on McGuire Street near Vance Street; he believed automatic weapons were used. Demarco did not know who started the gunfire, or where or why it started. When gunfire erupted, Demarco and his friends scattered and tried to run to safety.
 {¶ 32} Demarco was shot in the grassy area near Main Street and fell to the ground. Jerrel saw Demarco fall to the ground. James saw Demarco being shot and falling to the ground. James then observed appellant, who was with Shadeed, hit Demarco with a weapon. Although James did not know who shot Demarco, he observed appellant and Shadeed each with a weapon. He also saw Shadeed run towards Demarco and shoot when the latter was shot. Jeremy saw appellant with a weapon on Main Street between McGuire and Weaver Streets. Jeremy did not see appellant fire his weapon. Demetrius testified he was friends with Demarco; his sister, Lori, was Demarco's girlfriend. James, a friend of Demarco, testified he would lie for Demarco but had no reason to lie in the case at bar.
 {¶ 33} On direct examination, Demarco testified that while hiding behind a shed, he saw appellant and Shadeed chase Jeremy. Demarco yelled; appellant and Shadeed turned towards him and started shooting; Demarco "got hit;" he was in the grassy area near Main Street. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized appellant's voice. Another individual with appellant told appellant "to come on because the police was coming." Demarco did not know if the second voice was Shadeed's voice. Demarco testified that at that point he was in and out of consciousness.
 {¶ 34} On cross-examination, Demarco testified he believed appellant and *Page 12 
Shadeed were the two shooters chasing Jeremy but could not be positive; he did not know if he was shot by appellant, Shadeed, or both; he was hit once and the bullet was still in his body; he was not sure who the person who came to him was; he did not see appellant shoot at him or Jeremy, and he did not see appellant "walk up on [him] with a gun."
 {¶ 35} After a careful and thorough review of the record, we cannot conclude the jury lost its way and created a manifest miscarriage of justice when it found appellant guilty of felonious assault with a firearm specification. Demarco was shot during a surprise night-time shootout involving multiple assailants and at least four weapons. As they scattered and tried to run to safety, Demarco and his friends all had different vantage points and time sequences. Appellant was seen at the crime scene with a weapon and firing it, and was further seen in the vicinity of Demarco when the latter was shot. A jury is free to believe all, part, or none of the testimony of any witness who comes before it. See State v. Holdbrook, Butler App. No. CA2005-11-482, 2006-Ohio-5841.
 {¶ 36} Appellant's conviction for felonious assault with a firearm specification is not against the manifest weight of the evidence. Appellant's first assignment of error is overruled.
 {¶ 37} Assignment of Error No. 2:
 {¶ 38} "THE TRIAL COURT VIOLATED APPELLANT'S CONSTITUTIONAL, STATUTORY, AND PROCEDURAL RIGHTS TO A FAIR TRIAL AND HIS CONSTITUTIONAL RIGHT TO CONFRONTATION."
 {¶ 39} At the beginning of the second day of trial, the state moved the trial court *Page 13 
to allow Jerrel and Jeremy to be present in the courtroom during the remainder of the trial. Over the objections of all four defense attorneys, the trial court granted the state's motion on the ground that while they were witnesses, Jerrel and Jeremy were also victims and as such had the right to be present in the courtroom under Evid. R. 615(B)(4). Jerrel and Jeremy later testified for the state.
 {¶ 40} On appeal, appellant argues that his right to a fair trial was violated when the trial court allowed Jerrel and Jeremy to be present in the courtroom because it allowed them to hear the testimony of state witnesses Demetrius and James, two biased individuals, and possibly alter their own testimony. Appellant also asserts that the trial court improperly favored the rights of Jerrel and Jeremy over his constitutional rights.
 {¶ 41} A victim has a constitutional and statutory right to be present during trial unless the trial court determines that exclusion of the victim is necessary to protect the defendant's right to a fair trial.State v. Hines, Marion App. No. 9-05-13, 2005-Ohio-6696, ¶ 19. Article I, Section 10(A) of the Ohio Constitution "specifically provides victims constitutional rights to `reasonable and appropriate notice, information, access, and protection and to a meaningful role in the criminal justice process.'" Id.
 {¶ 42} R.C. 2930.09, in turn, provides that "a victim in a case may be present whenever the defendant is present during any stage of the case that is conducted on the record, other than a grand-jury proceeding, unless the court determines that exclusion of the victim is necessary to protect the defendant's right to a fair trial." State v. Jackson,107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 95, certiorari denied (2006),548 U.S. 912, 126 S.Ct. 2940. "Although R.C. 2930.09 provides that a defendant's fair-trial rights are superior to a victim's right to be present, the statute clearly gives the trial court discretion *Page 14 
to make the determination whether the victim's presence will prejudice the defendant." Id. at ¶ 96.
 {¶ 43} Further, Evid. R. 615 provides that even when there is a separation of witnesses, the victim has the right to be present. Specifically, Evid. R. 615(B)(4) provides that "[t]his rule does not authorize exclusion, in a criminal proceeding, [of] a victim of the charged offense to the extent that the victim's presence is authorized by statute enacted by the General Assembly." As noted, R.C. 2930.09
allows victims to be present during criminal proceedings other than grand jury proceedings.
 {¶ 44} As victims of the shootout, Jerrel and Jeremy had a constitutional and statutory right to be present at trial. Upon closely reviewing their testimony which followed Demetrius' cross-examination and James' testimony, we find that appellant has not demonstrated that his right to a fair trial was compromised in any way, and a review of the record does not reveal unfairness. See Hines, 2005-Ohio-6696;State v. Board, Cuyahoga App. No. 83832, 2004-Ohio-5215. Further, appellant's attorney (and the other three defense attorneys) cross-exam ined Jerrel and Jeremy and therefore had the opportunity to test whether their testimony was tailored or truthful. Appellant's second assignment of error is accordingly overruled.
 {¶ 45} Judgment affirmed.
RINGLAND and HENDRICKSON, JJ., concur.
[1] Demetrius testified observing a silver Nissan "Altima." However, the silver Nissan vehicle recovered after the shootout was a silver Nissan Maxima and was rented to Shadeed. The license plate number on the recovered vehicle was identical to the license plate number on the rental agreement signed by Shadeed. Nissan Altimas and Nissan Maximas are similar in appearance. *Page 1