[Cite as *State v. Zafar*, 2020-Ohio-3341.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 19AP-255 |
| | | (C.P.C. No. 18CR-850) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Mustafa Zafar, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 16, 2020

**On brief**: *Ron O'Brien*, Prosecuting Attorney, *Sheryl L. Prichard*, and *Valerie B. Swanson*, for appellee.

**On brief**: *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Mustafa Zafar, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of kidnapping and felonious assault.

{¶ 2} On February 20, 2018, appellant and a co-defendant, Dahir Ali, were each indicted on one count of kidnapping, in violation of R.C. 2905.01, and one count of felonious assault, in violation of R.C. 2903.11. The indictment arose out of an incident occurring at the Quick & Easy Mart, located at 4197 Cleveland Avenue, Columbus, on February 11, 2018.

{¶ 3} The matter came for trial before a jury beginning January 22, 2019. The first witness for the state was Darrian Abrams, age 45. In February 2018, Abrams was a maintenance worker at the Abby Lane Apartments, located across the street from the Quick & Easy Mart.

{¶ 4} On Sunday, February 11, 2018, Abrams and a friend, Gary Benson, stopped at the Quick & Easy Mart for Abrams to purchase a beverage. Abrams drove to the store in his pickup truck. Abrams exited his vehicle, while Benson remained seated inside the truck. Abrams entered the store and picked out a "Hard Mike's Lemonade." (Tr. Vol. II at 12.) The item cost approximately $1.65. Appellant was working behind the counter as a clerk, and Abrams took the beverage to the counter.

{¶ 5} Abrams placed the drink on the counter and, as he began to "swipe" his debit card, appellant informed him "there was an extra 50 cents." Abrams then "said, [o]h, here you go. Robbing me of my 50 cents again." Abrams stated: "It's common. All the corner stores do that. I don't know why, but they do. If you spend less than $5, they take 50 cents from you." (Tr. Vol. II at 13.) Abrams testified that he and appellant "jawed back and forth" and that appellant "threatened to hit me with a bat." (Tr. Vol. II at 14.)

{¶ 6} Abrams stated that another store clerk, later identified as co-defendant Ali, then "grab[bed] me from behind." (Tr. Vol. II at 15.) Ali grabbed Abrams by the upper arm, and Abrams "swatted his hand off me." Abrams used "an open palm push-off." (Tr. Vol. II at 16.) Ali then punched Abrams in the face, and Abrams swung back at him. Abrams then testified: "I was getting hit from behind the counter with a bat. I ended up on the ground. They were kicking me, punching me, stomping me. I was begging them to not hit me [anymore]." Abrams "tried to escape," but "[t]hey wouldn't let me." Abrams stated he "almost got out," but "[t]hey drug me back in the store. And I'm begging them to stop hitting me." During the incident, appellant locked the front entrance door of the store. Abrams "thought they were going to kill me." (Tr. Vol. II at 17.) At trial, Abrams identified appellant as the individual who was hitting him with an aluminum baseball bat.

{¶ 7} Abrams testified he did not swing at appellant and did not threaten the store clerks. Abrams further stated he "wasn't aggressive. I didn't want to fight." Abrams did not feel free to leave; he "tried to get up one time, and they started beating me again."

Abrams asked for "their permission; can I get up and leave?" (Tr. Vol. II at 18.) The store clerks eventually unlocked the front door, and Abrams was permitted to leave.

{¶ 8} During Abrams' testimony, the state played surveillance video from the store depicting the incident. Abrams identified appellant on the video and stated appellant hit him multiple times with the bat, including strikes to the arm, wrist, and leg. Appellant "was asking me do I know who he is? Do you know who I am? Do you know who I am?" (Tr. Vol. II at 30.) The other store clerk, Ali, is depicted kicking Abrams as he lay on the ground. Abrams described attempting, at one point, to leave the store but he was "yanked back in." (Tr. Vol. II at 33.) Abrams denied having any type of weapon, and he denied ever threatening to shoot the clerks.

{¶ 9} After eventually exiting the store, Abrams sat on the hood of his vehicle in the parking lot and dialed 911. Benson "couldn't believe what was happening." (Tr. Vol. II at 39.) Police officers arrived within five minutes. Abrams was later transported to Riverside Methodist Hospital for evaluation. As a result of the incident, Abrams suffered "swelling on my legs, my back. Huge eye -- blood clots in it." (Tr. Vol. II at 40.) At trial, the state introduced photographs of Abrams taken shortly after the altercation.

{¶ 10} The state also presented the testimony of Gary Benson, age 65. In the early afternoon of February 11, 2018, Benson, a friend and neighbor of Abrams, rode with Abrams to the Quick & Easy Mart on Cleveland Avenue. Benson remained inside Abrams' pickup truck while Abrams went into the store.

{¶ 11} While sitting in the vehicle, Benson observed some individuals approach the store, but they were "stopped" from entering. He then saw "a gentleman in a plaid shirt" come up and lock the front door. (Tr. Vol. II at 68.) At trial, Benson identified appellant as the individual he observed in the plaid shirt that day.

{¶ 12} Benson, who was beginning to worry about Abrams, then observed Abrams near the front door "as if he was coming out, and he got snatched back," prompting Benson "to get out of the truck." (Tr. Vol. II at 71.) Benson exited the pickup truck and went to the door but "couldn't get in." He observed "the young man and the older guy beating" Abrams. One individual was "swinging" a bat, while "the other one was hitting" Abrams. (Tr. Vol. II at 72.) Benson identified appellant as the individual swinging an aluminum bat at Abrams. Benson testified that Abrams "was on the ground. They hit

him that hard to where he fell to the ground, literally."  Benson testified that appellant struck Abrams "[m]ultiple times" with the bat.  (Tr. Vol. II at 73.)  Benson did not observe Abrams throw any punches or attempt to fight back during the incident.

{¶ 13} From outside the door, Benson heard Abrams state: "Man, please don't kill me.  I got eight kids."  Abrams "was scared," and Benson began to knock on the door, asking "[w]hat you all doing to my friend?"  (Tr. Vol. II at 74.)  When Abrams eventually came out of the store "[h]e was hurt.  He was limping.  He couldn't hardly see."  (Tr. Vol. II at 75.)  Following the incident, Abrams phoned police; an ambulance subsequently arrived and transported him to the hospital.

{¶ 14} At the close of the state's evidence, counsel for appellant moved for a judgment of acquittal under Crim.R. 29.  The trial court denied the motion.

{¶ 15} Sohail Iqbal, the owner of the Quick & Easy Mart, testified on behalf of appellant.  Iqbal testified the store sells items such as "[b]eer, wine, cigarettes, and some groceries and pop."  (Tr. Vol. II at 105.)  Around the time of the incident, Ali had just started working at the store.  Ali spoke Spanish, and Iqbal did not believe he could speak English.  Iqbal was not present at the store during the events of February 11, 2018, and Iqbal has not seen Ali since that date.

{¶ 16} Iqbal has several security cameras in the store because "we feel unsafe there."  (Tr. Vol. II at 110.)  Iqbal testified that individuals have stolen items from the store.  He stated there is a baseball bat behind the counter "for a safety measure, if we are attacked with something, so that we can save ourselves."  (Tr. Vol. II at 116.)  A revolver is also kept behind the counter.  A sign inside the store indicates the store charges 50 cents for any credit or debit card transaction under $5.00.  Appellant's father works at the store, but appellant sometimes fills in for his father at the store if he is not feeling well.

{¶ 17} Zafar Mehdi, the father of appellant, is employed at the Quick & Easy Mart. Mehdi testified he suffers from diabetes and high cholesterol.  On February 11, 2018, Mehdi was not feeling well, so appellant went to the store to work in his place that day. Mehdi testified that the store has experienced issues with theft.  Two days prior to the incident, Mehdi worked with a new employee named Ali.  Mehdi communicated with Ali in "Hindi."  According to Mehdi, Ali understands English, but "he cannot speak" it.  (Tr. V0l. II at 137.)

{¶ 18} Appellant, age 20, testified on his own behalf. Appellant occasionally works as a cashier at the Quick & Easy Mart when his father is unable to work due to health issues. Appellant testified that "[a]lmost every day somebody would be there to argue with you, try to fight you, try to like steal some candy, stuff like that. Not try to rob you, but like try to steal the stuff." (Tr. Vol. II at 146.)

{¶ 19} On February 11, 2018, appellant was working at the store with Ali, who appellant met for the first time that day; appellant spoke with Ali in Hindi. Later that day, Abrams came to the counter to purchase a "Mike's Hard Lemonade, 24-ounce drink." Appellant testified he told Abrams the "total is $2.35. I see him pulling out his wallet. I let him know, because he's going to use his card, I let him know that using your card for less than $5 is going to charge you 50-cent-charge fee." (Tr. Vol. II at 154.) Abrams asked appellant: "Why are you like charging me 50 cents? Why are you robbing us people? (Tr. Vol. II at 155.) Appellant testified that he told Abrams: "Don't you understand? I tell him. And he's like, I'll beat you up." (Tr. Vol. II at 156.)

{¶ 20} Appellant testified that Abrams "talks about my appearance, like why I'm wearing a tight shirt." (Tr. Vol. II at 159.) Appellant responded: "Bitch, none of your business." Abrams then "grabs the can. Did you call me a bitch? I said, Yes, I did call you bitch." (Tr. Vol. II at 158.) According to appellant, Abrams then "said, I will kill you." Appellant then reached back "to get the bat." (Tr. Vol. II at 159.) Appellant testified that Abrams stated: "Hit me with a bat and I'll shoot you if you hit me with it." (Tr. Vol. II at 160.)

{¶ 21} At that point, Ali approached Abrams and "grabs him by the shoulder." Appellant then observed Abrams "punching" Ali on his arm. (Tr. Vol. II at 160.) Appellant then testified: "At that time, * * * all of a sudden in my mind, I'm like he's about to hit him, about to punch him. Then my bat was already in my hand, so I'm like I got to do self-defense now, because he's going to hurt us or something, so we got to take care, you know." Appellant testified he was "pretty scared" because of Abrams' threats to "kill" and "shoot" him. (Tr. Vol. II at 161.)

{¶ 22} Appellant then began striking Abrams with the bat. Appellant observed Abrams "trying to get out" of the store. Appellant testified that Ali grabbed Abrams and "brought him back in again, so * * * in my mind, I was like I got to settle this thing down,

you know."  (Tr. Vol. II at 163.)   Appellant continued to swing the bat at Abrams. Appellant testified he was "trying to aim for his legs."  (Tr. Vol. II at 164.)  Appellant hit Abrams "three times on his leg."  (Tr. Vol. II at 165.)  Appellant then locked the door to prevent other customers from entering.  Appellant testified the situation was "controlled. And I go back, try to confirm, Hey, you wanting to kill me, you want to shoot me.  What happen now?  So I'm kind of like pumped."  (Tr. Vol. II at 166-67.)

{¶ 23} Appellant testified he picked up the phone but did not call the police because the phone "said 'no line.' "  (Tr. Vol. II at 170.)  Appellant subsequently told police officers "we had a fight/argument over the 50-cent charge and it led to this."  (Tr. Vol. II at 178.)

{¶ 24} On cross-examination, appellant acknowledged telling a detective that Abrams began cussing at him, but he did not remember what words Abrams used. Appellant acknowledged that he began cussing back at Abrams.  Appellant told the detective that Abrams threatened to kill him but that he did not take it seriously. Appellant explained that he was telling the detective: "I knew he wasn't going to like kill me kill me in real life." (Tr. Vol. II at 188.)  Appellant told the detective that store patrons often make such threats to kill.  Appellant acknowledged telling the detective he was mad, "just out of my mind," and "[i]t wasn't respectful."  (Tr. Vol. II at 191.)

{¶ 25} Appellant agreed he picked up the baseball bat before Ali came over and grabbed Abrams by the shoulder.  Appellant first struck Abrams in the upper body with the bat, and he hit Abrams with the bat before he heard Ali say "gun." (Tr. Vol. II at 207.) Appellant did not tell the detective he struck Abrams anywhere but on the legs.

{¶ 26} Following deliberations, the jury returned verdicts finding appellant guilty of kidnapping and felonious assault.  By entry filed April 29, 2019, the trial court sentenced appellant to community control sanctions, including a three-year period of community control, 33 days incarceration at the Franklin County Correction Center, and a fine.

{¶ 27} On appeal, appellant sets forth the following three assignments of error for this court's review:

> [I.]    AMENDED    R.C.    2901.05    SHOULD    APPLY
> RETROACTIVELY TO THIS APPEAL.

[II.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S R. 29 MOTION FOR ACQUITTAL.

[III.] THE VERDICTS OF KIDNAPPING AND FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 28} Under the first assignment of error, appellant asserts amended R.C. 2901.05 should apply retroactively to this appeal. Appellant notes the Ohio General Assembly enacted Am.Sub.H.B. No. 228 ("H.B. 228") on December 27, 2018, in which it amended R.C. 2901.05 to now place the burden on the state (rather than the accused) to prove the accused did not use force in self-defense.

{¶ 29} Appellant argues it is unclear from the plain text of the bill whether it was the General Assembly's intent that the changes to R.C. 2901.05 be applied retroactively to offenses committed prior to the effective date of the amendment. Appellant acknowledges that, under R.C. 1.48, a statute is presumed to be prospective in its operation unless it is expressly made retroactive. Appellant further argues, however, citing *Griffith v. Kentucky,* 479 U.S. 314, 328 (1987), the United States Supreme Court has held that a new rule for the conduct of criminal prosecution is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a clear break with the past. According to appellant, the changes by H.B. 228 to R.C. 2901.05 reflect a new rule for the conduct of criminal prosecutions, i.e., the allocation of the burden of proof in certain types of cases, and that such rule represents a clear break with the past.

{¶ 30} In response, the state notes the changes to R.C. 2901.05 took effect on March 28, 2019, and the trial in this case began January 22, 2019 (i.e., the use of force at issue occurred prior to the effective date of the amended statute, and the case was tried months before that effective date). The state maintains the amendment at issue was not expressly made retrospective and, therefore, is presumed prospective. We agree.

{¶ 31} Ohio courts addressing this issue, including this court, have held that the change made by H.B. 228 "was not retroactive." *State v. Ward,* 10th Dist. No. 19AP-266, 2020-Ohio-465, ¶ 15 (because the defendant committed the offense prior to amendment,

the former version of R.C. 2901.05(A) applied).  *See also State v. Whitman*, 5th Dist. No. 2019CA00094, 2019-Ohio-4140, ¶ 11 ("Changes to R.C. 2901.05, effective March 28, 2019, do not apply retroactively to appellant's case" and, therefore, "[t]he statute as amended does not provide for retroactive application."); *State v. Koch*, 2d Dist. No. 28000, 2019-Ohio-4099, ¶ 103 (rejecting appellant's reliance on *Griffith* in holding he was "not entitled to retroactive application of the burden-shifting changes made by the legislature to Ohio's self-defense statute, R.C. 2901.05, as a result of H.B. 228"); *State v. Fisher*, 8th Dist. No. 108494, 2020-Ohio-670, ¶ 24, fn. 2 (because the defendant's trial occurred before the effective date of the amendment, the amendments under H.B. 228 "do not apply").

{¶ 32} Based on the above cited authority, appellant was not entitled to retroactive application of the burden shifting changes made by the legislature to Ohio's self-defense statute pursuant to H.B. 228.  *Koch* at ¶ 103.  Accordingly, appellant's first assignment of error is not well-taken and is overruled.

{¶ 33} Appellant's second and third assignments of error are interrelated and will be considered together.  Under these assignments of error, appellant challenges both the sufficiency and manifest weight of the evidence in support of his convictions for kidnapping and felonious assault.

{¶ 34} Appellant first raises an argument dependent on the one he raised under the previous assignment of error.  Specifically, appellant argues the evidence was insufficient to support the convictions based on his contention that, in accordance with the provisions of amended R.C. 2901.05, the prosecution failed to prove beyond a reasonable doubt he did not use force in self-defense.  In light of our disposition of the first assignment of error, we reject appellant's initial premise that the state bore the burden of proving beyond a reasonable doubt the force was not used in self-defense.

{¶ 35} A motion for judgment of acquittal, made pursuant to Crim.R. 29, "tests the sufficiency of the evidence."  *State v. Darrington*, 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15.  As such, "an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim."  *Id.* In considering a sufficiency of the evidence challenge, "the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most

favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 36} By contrast, in determining whether a conviction is against the manifest weight of the evidence, an appellate court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 37} The offense of kidnapping is set forth under R.C. 2905.01(A) and states in part:

> No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another.

{¶ 38} R.C. 2903.11 defines the offense of felonious assault. R.C. 2903.11(A)(2) states in part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." Pursuant to R.C. 2901.22(B) "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶ 39} In order to establish self-defense, the following elements are required to be shown: "(1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the accused must not have violated any duty to retreat or avoid the danger."

*State v. Gripper*, 10th Dist. No. 12AP-396, 2013-Ohio-2740, ¶ 18, citing *State v. Melchior*, 56 Ohio St.2d 15, 20-21 (1978).

{¶ 40} We first address appellant's sufficiency challenge, which he raises in the context of the claim he acted in self-defense.  Again, to the extent appellant argues the burden was on the state, under amended R.C. 2901.05, to show the accused was not justified in using self-defense, we find such argument not well-taken based on our disposition of the first assignment of error.

{¶ 41} We further note appellant does "not deny" that he and the other store clerk (Dahir Ali) "beat the victim."  (Appellant's Brief at 14.)  Rather, appellant maintains his actions were justified on grounds he acted in self-defense.  Appellant points to evidence that the store was subjected to consistent harassment by its patrons.  He further argues that Abrams' actions gave rise to the altercation.  Specifically, appellant notes Abrams accused appellant of robbery for charging the 50-cent store fee, and appellant contends Abrams responded in a generally hostile manner.

{¶ 42} Under Ohio law, "[s]elf-defense is an affirmative defense."  *Gripper* at ¶ 24, citing *State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831, ¶ 21, citing *State v. Calderon*, 10th Dist. No. 05AP-1151, 2007-Ohio-377, ¶ 30.  Further, "[a] review for sufficiency of the evidence does not apply to affirmative defenses, because this review does not consider the strength of defense evidence."  *Id.*, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 37.  Accordingly, "appellant cannot challenge the jury's rejection of his claim of self-defense on the ground of sufficiency of the evidence."  *Id.  See also State v. Colon*, 8th Dist. No. 106031, 2018-Ohio-1507, ¶ 16 ("When reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability.").  We therefore will consider appellant's claim of self-defense when reviewing his manifest weight challenge.

{¶ 43} Turning first to a consideration of the sufficiency of the evidence, the state presented testimony that the victim, Abrams, went to the store counter to purchase a beverage; Abrams complained to appellant about an extra 50-cent charge, and the two individuals "jawed back and forth."  Abrams testified that appellant "threatened to hit me

with a bat." (Tr. Vol. II at 14.) As appellant reached behind him for an aluminum baseball bat, the other store clerk, co-defendant Ali, approached Abrams from behind, grabbed his arm and "yanked [him] around." (Tr. Vol. II at 28.) Abrams "swatted his hand off" with "an open palm push-off." (Tr. Vol. II at 16.)

{¶ 44} Ali then punched Abrams in the face, and Abrams swung back at him; at that time, appellant, while standing behind the counter, began striking Abrams with the aluminum baseball bat, hitting Abrams initially in the neck area. Abrams attempted to exit the store but "[t]hey wouldn't let me." He "almost got out," but they "drug [him] back in the store" as he was "begging them to stop hitting me." Abrams eventually ended up on the ground and recounted that appellant and Ali "were kicking me, punching me, stomping me." Abrams was "begging them to not hit me," and he thought he "was going to die." (Tr. Vol. II at 17.) After Abrams was pulled back inside, appellant locked the door to the store. Abrams "tried to get up one time, and they started beating me again." (Tr. Vol. II at 18.)

{¶ 45} Abrams testified he did not swing at appellant during the incident, nor did he threaten the clerks. According to Abrams, he was not aggressive, and he "didn't want to fight." (Tr. Vol. II at 18.) Abrams, who was treated at a hospital following the incident, testified that he suffered swelling on his legs and back and that his eye was "[h]uge * * * blood clots in it." (Tr. Vol. II at 40.) At trial, Abrams identified photographs of his injuries. The state also introduced, during the testimony of Abrams, store surveillance video depicting the events that day.

{¶ 46} Abrams' friend, Benson, similarly testified that Abrams attempted to get out of the store but "he got snatched back," prompting Benson to exit the truck and go to the door. (Tr. Vol. II at 71.) Benson observed "the young man and the older guy beating" Abrams. (Tr. Vol. II at 72.) He saw appellant swinging an aluminum bat at Abrams, striking him "[m]ultiple times." (Tr. Vol. II at 73.) Benson did not observe Abrams throw any punches, and he heard Abrams plead with them, stating "please don't kill me. I got eight kids." (Tr. Vol. II at 74.) Benson stated that Abrams was scared, and when he eventually emerged from the store he was "hurt" and "limping." (Tr. Vol. II at 75.)

{¶ 47} This court and other Ohio appellate courts "have repeatedly held that a baseball bat, wielded with the requisite intent, meets the definition of R.C. 2923.11(A) as a

deadly weapon." *State v. Clouse*, 10th Dist. No. 11AP-857, 2012-Ohio-3471, ¶ 35. *See also State v. Hoffmeyer*, 9th Dist. No. 23712, 2008-Ohio-2311, ¶ 14 (evidence that defendant hit victim with an aluminum baseball bat, resulting in injuries to elbow and eye, sufficient to convince average juror that defendant caused physical harm by means of a deadly weapon under R.C. 2903.11(A)). Here, construing the evidence most strongly in favor of the state, the trial court did not err in denying appellant's motion for judgment of acquittal as the prosecution presented sufficient evidence to prove the elements of felonious assault and kidnapping beyond a reasonable doubt.

{¶ 48} We therefore turn to appellant's primary argument, i.e., that his convictions are against the manifest weight of the evidence based on his claim that he only utilized force in lawful self-defense. In support, appellant points to Abrams' admission that he and appellant engaged in an "animated" verbal altercation. (Tr. Vol. II at 26.) Appellant contends this altercation caused him to fear for his life, necessitating the use of force. Appellant cites his own testimony in which he stated he heard the other store clerk (Dahir Ali) say the word "gun" during the incident. Appellant also maintains he only locked the store door during the incident as a means of protecting himself.

{¶ 49} In response, the state argues the store video demonstrates appellant's testimony was not credible. Specifically, the state contends it is clear from the video Abrams was not resisting, that he ran for the door but was pulled back inside the store; further, after Abrams was forced back inside, the video depicts appellant and Ali continuing to strike, punch, and kick the victim as he fell to the ground and as he remained in a passive position on the floor. The state also maintains it makes no sense that appellant would lock the door to protect himself from the victim.

{¶ 50} A review of the video footage supports the state's argument that Abrams, after the initial encounter with Ali, was not attempting to hit appellant or Ali; rather, Abrams attempted to exit the store after Ali punched him in the face and appellant began striking him from behind with the aluminum baseball bat. The video further shows Abrams was able to open the door but was grabbed by Ali and brought back inside the store. At that time, appellant continued to strike at Abrams with the baseball bat as Ali grabbed and held Abrams by his jacket. The video shows Abrams falling to the ground after appellant strikes him on the arm with the bat; while Abrams is on the ground,

appellant, while holding the bat in both hands, strikes Abrams repeatedly on his legs. Appellant then locks the front door as Ali is depicted punching Abrams multiple times on the back with his fists. As Abrams remains on the ground, appellant stands over him with the bat and, a few seconds later, Ali repeatedly kicks Abrams. Thus, the video exhibit supports the state's argument that Abrams was not moving or resisting at the time but, rather, was in a passive position on the floor.

{¶ 51} As noted under the facts, Abrams testified he argued with appellant over the 50-cent store fee, but he denied threatening appellant. While appellant testified he was fearful based on threats made by Abrams during the incident, the trier of fact was free to "believe or disbelieve any or all of the testimony presented." *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257. In this respect, "[t]he trier of fact is in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible." *Id*. Further, the Supreme Court of Ohio has held that "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Shane*, 63 Ohio St.3d 630, 637 (1992). Rather, " '[t]he circumstances surrounding such language or words goes to the issue of whether a defendant had an honest belief that he [or she] was in imminent danger of death or great bodily harm.' " *State v. Rizer*, 4th Dist. No. 10CA3, 2011-Ohio-5702, ¶ 30, quoting *State v. DiPaolo*, 7th Dist. No. 92-B-55 (July 1, 1994). Thus, "[f]or example, devoid of its context even a statement like 'I am going to kill you' might not create a bona fide belief of imminent danger of death or great bodily harm." *Id*. In the present case, appellant acknowledged telling the detective during an interview: "I knew he wasn't going to like kill me kill me in real life." (Tr. Vol. II at 188.)

{¶ 52} Appellant also acknowledged that he struck Abrams in the upper body multiple times with the bat but only indicated to the detective that he struck him on the legs. Under Ohio law, there are "limitations to the application of self-defense," and the defense "is not available unless the defendant shows that the force used to repel the danger was not more than the situation reasonably demanded." *State v. Johnson*, 6th Dist. No. L-08-1325, 2009-Ohio-3500, ¶ 12. Thus, " '[t]he force used to defend must be objectively necessary and reasonable under the facts and circumstances of the case and in

view of the danger apprehended.' " *Id.*, quoting *Martin v. Cent. Ohio Transit Auth.*, 70 Ohio App.3d 83, 93 (10th Dist.1990). Accordingly, "[w]hen one uses a greater degree of force than is necessary under all the circumstances, it is not justifiable on the ground of self-defense." *Id.*, citing *State v. McLeod*, 82 Ohio App. 155, 157 (9th Dist.1948).

{¶ 53} Here, the jury could have reasonably rejected appellant's claim of self-defense and, instead, found the testimony of Abrams credible as corroborated by the testimony of Benson and the video exhibit which depicted appellant and the co-defendant, Ali, repeatedly striking Abrams while he offered little or no resistance (including footage showing his attempt to cover up on the ground as he was being struck). *See*, *e.g.*, *State v. Cronin*, 6th Dist. No. S-09-032, 2010-Ohio-4717, ¶ 39 (no miscarriage of justice by jury in rejecting self-defense claim or finding defendant acted with excessive force where evidence indicated defendant pummeled victim with bat as victim was motionless or rolling around on floor); *State v. Huff*, 4th Dist. No. 06CA7, 2006-Ohio-5081, ¶ 14 (jury reasonably rejected self-defense argument where evidence showed victim dropped weapon but the defendant "nevertheless continued to strike [victim] with his bat"). Based on the evidence presented, the jury could have also rationally rejected the notion that appellant locked the door (i.e., locked the victim inside the store) to protect himself from Abrams.

{¶ 54} On review of the record, we find the jury did not lose its way, nor create a manifest miscarriage of justice, in finding appellant guilty of felonious assault and kidnapping. Thus, we conclude appellant's convictions were based on sufficient evidence and were not against the manifest weight of the evidence. Accordingly, appellant's second and third assignments of error are overruled.

{¶ 55} Based on the foregoing, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BRUNNER and BEATTY BLUNT, JJ., concur.

_____