[Cite as *State v. Rose*, 2024-Ohio-5689.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240219 |
| | | TRIAL NO. C/23/CRB/22345 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| MARCI ROSE, | : | *O P I N I O N* |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: December 6, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill*, *Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffman*, Assistant Public Defender, for Defendant-Appellant.

**Bоск, Presiding Judge.**

{¶1} Tensions over childcare culminated in a fight between defendant-appellant Marci Rose and A.H., Rose's daughter-in-law. On appeal, Rose challenges her misdemeanor assault conviction and argues that the weight of the evidence supports her self-defense claim.

{¶2} But the trial court found credible A.H.'s testimony, which demonstrated that Rose was the initial aggressor, at fault, and violated a duty to retreat and Rose's force was unnecessary to repel any alleged threat. A.H.'s testimony was not so contradictory as to justify a departure from the trial court's credibility finding.

{¶3} We overrule Rose's assignment of error and affirm her conviction. But we remand the case to the trial court to correct a clerical error in the record—that Rose was convicted by plea—with a nunc pro tunc entry that reflects Rose's not-guilty plea and the fact that she was convicted by verdict.

## I. *Factual and Procedural History*

{¶4} The State charged Rose with misdemeanor assault in violation of R.C. 2903.13, alleging that Rose harmed A.H. At Rose's bench trial, A.H. testified that she is Rose's daughter-in-law, and Rose is the biological grandmother of two of A.H.'s three children.

{¶5} The following facts are not in dispute. Rose asked A.H. to babysit Rose's granddaughter, B, because Rose had to work. A.H. "didn't mind." According to A.H., "[e]verything was fine" when Rose dropped off B. At some point, Rose called A.H. to arrange a time for her to pick up B. But B wanted to continue playing with A.H.'s children, so B stayed.

{¶6} Later that day, A.H. asked Rose to babysit two of A.H.'s children that evening—Rose's "biological grandson" and A.H.'s daughter, who is unrelated to Rose.

2

When Rose declined, A.H. arranged for A.H.'s grandmother to babysit the children at 7:30 p.m. A.H. told Rose she needed to pick up B at 7:00 p.m.

{¶7} According to A.H., she had "words back and forth" with Rose over text messages. A.H. characterized Rose's messages as "hostile." Specifically, A.H. asked if Rose was on her way, and Rose responded, "[D]idn't you tell me to tell you when I am on my way." Rose assured A.H., "[W]ell, I'm working, but baby, I am coming."

### A. A.H.'s account of the fight

{¶8} According to A.H., Rose arrived shortly after 7:00 p.m. As B gathered her coat and shoes, A.H. opened the door "a little bit" for B to leave. Rose "stopped the door and h[e]ld it open with her hand and walked her way into" the house. Rose told A.H.'s oldest daughter to "take them kids upstairs so I can talk to her because she's being too f---ing disrespectful." Rose demanded that A.H. stop interfering with her relationship with her grandchildren. For her part, A.H. told Rose that the children did not "have to go upstairs." A.H. stood at her front door and repeatedly instructed Rose "to get out of my house."

{¶9} Rose was pointing at A.H., holding her finger inches from A.H.'s face. Rose eventually poked A.H. in the eye. A.H. grabbed Rose's hand "and told her, do not put your hands on me." Rose "started swinging." The children watched as Rose tore off A.H.'s wig, pushed A.H. onto the couch, pinned down A.H., and delivered several punches to A.H.'s face. A.H. did not hit Rose because Rose pinned A.H.'s arms under Rose's knees, and A.H. "did not want to fight her" in front of the children. A.H. weighs 106 pounds, and Rose was heavier than her.

{¶10} When Rose stood up, A.H. ran upstairs and called her mother. But when she returned downstairs, the children were gone. Rose had taken A.H.'s children to her car. A.H. ran after them, and without any incident, Rose handed over the children

to A.H. Yet, Rose sat outside of A.H.'s house until A.H. warned Rose that the police were on their way.

{¶11} As a result of the fight, A.H. had "knots" on her forehead. She had a cut under one eye, a popped blood vessel in an eye, and two black eyes. Ten photographs of A.H. admitted into evidence depict her injuries.

### B. Rose's account of the fight

{¶12} Not surprisingly, Rose's account of the fight differed from A.H.'s. Rose testified to wearing leg braces because she is "bone to bone on both knees" and has osteoarthritis. Rose testified that around 7:00 p.m., A.H. texted to ask Rose where she was and if she was on her way. The two were having "a little dispute." Rose arrived at A.H.'s house around 7:15 p.m.

{¶13} Rose was "knocking and knocking" until A.H. "finally came and answered the door." Rose conceded that the two were mad at each other. But Rose testified that A.H. "opened the door and let me in."

{¶14} Rose told B to "take the kids upstairs" because Rose and A.H. "need to talk." Rose knew the two "were going to be arguing" because Rose "had talked to her before about her mouth, how disrespectful she is." Rose preferred to argue outside of the children's presence because A.H.'s "mouth is real disrespectful."

{¶15} Rose explained, "I talk with my hands all the time." Rose warned A.H., "[Y]ou are going to stop." Rose, in the same tone that she "chastise[s]" her children and grandchildren, told A.H., "[Y]ou are going to stop talking to me like that . . . my own children don't talk to me like that. You're going to stop being disrespectful to me." A.H. "smacked" Rose's hand and the two "started fighting." Rose clarified that A.H. "smacked [her] hand down" with enough force to make a sound. Then, they started fighting. Rose feared A.H. because of their age discrepancy—Rose is "a senior citizen,"

while A.H. is "younger."

**{¶16}** Rose recalled that A.H. was "hitting me and kicking me and some of everything" during the fight. As a result, Rose "had a big bruise" on the side of her abdomen. Rose photographed that bruise, and that photograph was admitted into evidence. Rose's injury was exacerbated by the "blood thinners" she takes.

**{¶17}** After the fight, Rose consoled her grandchildren. According to Rose, "[A.H.] hugged me. We apologized. And she went upstairs." A.H. initially gave Rose permission to take the children but after A.H. spoke with her mother, she "changed and said, no, they can't go with you." A.H. told Rose that A.H.'s mother and Rose's son were both coming over to resolve the dispute, so Rose waited outside of A.H.'s house.

### C. The trial court found Rose guilty

**{¶18}** The trial court explained to the parties that "this case comes down to credibility of the witnesses." It found that the State proved, beyond a reasonable doubt, that Rose did not act in self-defense.

**{¶19}** Specifically, it believed A.H.'s version of the events because A.H. "was very credible." A.H.'s testimony was "corroborated by her injuries that she submitted to the court." The trial court emphasized the fact that Rose "asked the kids to go upstairs," and explained, "I know why you did. You wanted to fight. That's why you asked them to go upstairs." It noted that Rose is "a lot bigger than [A.H.] . . . a lot bigger." It did not believe that Rose's injury was caused by A.H. It also did not believe that A.H. smacked Rose's hand. Instead, the trial court explained to Rose, A.H. "was getting your finger out of her face. You were in her home. I don't believe she invited you in her home."

**{¶20}** The trial court sentenced Rose to 180 days in jail, with 176 days suspended, and credited Rose with four days of jail time and fined her $200.

## II. Analysis

### A. The State disproved Rose's self-defense claim

{¶21} In a single assignment of error, Rose argues that her conviction is contrary to the manifest weight of the evidence. She challenges several of the trial court's factual findings that support its conclusion that Rose did not act in self-defense.

### 1. Standard of review and self-defense law

{¶22} When a defendant presents sufficient evidence that she acted in self-defense, the State shoulders the burden of proving, beyond a reasonable doubt, that the defendant did not act in self-defense. *State v. Mitchell*, 2023-Ohio-2604, ¶ 12 (1st Dist.), citing *State v. Messenger*, 2022-Ohio-456, ¶ 25.

{¶23} We review the trial court's determination that the State disproved a self-defense claim under a manifest-weight standard. *Id.* at ¶ 13. To reverse the trial court's decision, we "must conclude that the evidence weighs heavily against conviction." *Id.* at ¶ 15. Specifically, we review the record, weigh the evidence, and consider the credibility of the witnesses to see if the trial court's decision amounts to a manifest miscarriage of justice. *State v. Howell*, 2017-Ohio-7182, ¶ 19 (1st Dist.). When confronted with conflicting evidence, we interpret the evidence in a manner consistent with the trial court's judgment. *In re J.C.,* 2019-Ohio-4027, ¶ 20 (1st Dist.).

{¶24} At the same time, we are "'not required to accept the incredible as true.'" *State v. Barnes*, 2017-Ohio-383, ¶ 1 (8th Dist.), quoting *State v. Clark,* 101 Ohio App.3d 389, 408 (8th Dist. 1995), citing *State v. Mattison*, 23 Ohio App.3d 10, 14 (8th Dist. 1985), quoting *State v. Gaston* 1979 Ohio App. LEXIS 12003 (8th Dist. Jan. 11, 1979). Courts have identified several factors that can assist an appellate court conducting a manifest-weight review, including (1) whether the evidence was uncontradicted, (2) whether a key witness was impeached, (3) what the evidence does

not establish, (4) the certainty and reliability of the evidence, (5) witness impartiality or disinterest, and (6) if the evidence is "'vague, uncertain, conflicting, or fragmentary.'" *Id.,* quoting *Clark* at 408.

**{¶25}** Nondeadly force may be used in self-defense by a person that (1) was not at fault for instigating or provoking the conflict and ultimate confrontation, (2) reasonably believed she faced certain and imminent bodily harm, (3) used force that was necessary to prevent that harm, and (4) did not violate any applicable duty to retreat. *State v. Ridley*, 2022-Ohio-2561, ¶ 15. (1st Dist.); *see State v. Bandy,* 2017-Ohio-5593, ¶ 56 (1st Dist.). These elements are cumulative, and a self-defense claim fails if the State disproves just one element. *Id.*

**{¶26}** For self-defense claims, witness credibility is often the core issue. *See State v. Gardner*, 2022-Ohio-381, ¶ 26 (8th Dist.); *see also State v. Ellis,* 2023-Ohio-4692, ¶ 61 (5th Dist.). Convictions are not contrary to the manifest weight of the evidence merely because the trial court found the victim credible, and the defendant incredible. *State v. Jackson*, 2024-Ohio-2728, ¶ 17 (1st Dist.); *see State v. Hughkeith,* 2023-Ohio-1217, ¶ 58 (8th Dist.). We traditionally have deferred to the trier of fact's credibility findings because it is in the "best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Bullock,* 2022-Ohio-925, ¶ 14 (1st Dist.). Plus, the trier of fact is "free to 'believe or disbelieve any or all of the testimony presented.'" *State v. Zafar*, 2020-Ohio-3341, ¶ 51 (10th Dist.), quoting *State v. Favor*, 2008-Ohio-5371, ¶ 10 (10th Dist.).

**{¶27}** Every element of Rose's self-defense claim turned on the credibility of A.H. and Rose. If A.H.'s testimony were believed, Rose's self-defense claim fails because Rose was at fault, Rose's force was not necessary to repel any perceived bodily harm, and Rose violated a duty to retreat. If Rose's testimony were believed, Rose was

invited into the house, that invitation was never revoked, A.H. was at fault because A.H. smacked Rose's hand, and Rose's force was necessary to fend off A.H., who is younger than Rose and does not have osteoarthritis in her knees.

### 2. *The State disproved Rose's assertion that she was not "at fault" for causing the altercation*

{¶28} Beginning with the "at fault" element, the "initial aggressor" is considered "at fault." *State v. Hendrickson,* 2009-Ohio-4416, ¶ 27 (4th Dist.); *see Mitchell*, 2023-Ohio-2604, at ¶ 19 (1st Dist.), *see also State v. Gaston* 2013-Ohio-2331, ¶ 16 (8th Dist.) (collecting cases). An initial aggressor can be the first to use force or the person whose "wrongful" behavior provoked the assault. *Id.* In other words, "a defendant voluntarily participating in or initiating a confrontation, especially for purposes other than protection, cannot justify or excuse" her use of force. *State v. Smith*, 2021-Ohio-1185, ¶ 23 (8th Dist.). In *Gaston,* the defendant was at fault after he "took the pool balls off the table so no one else could play pool," responded to an insult by saying "'come say that to my face[,]' and then waited for [the other person] to walk down the hall toward him." *Gaston* at ¶ 17. Though the defendant did not throw the first punch, he "sought to engage" his counterpart and provoked the altercation. *Id.*

{¶29} Both Rose's and A.H.'s testimony indicate that Rose entered A.H.'s home with some animus. A.H. testified that she did not allow Rose in the house, Rose forced her way in, and Rose pointed her finger in A.H.'s face before she poked A.H.'s eye. Rose testified that she is animated when she speaks and spoke with her hands when she chastised A.H., A.H. had opened the door for her, Rose told the children to go upstairs to shield them from A.H.'s language, and A.H. slapped Rose's hand.

{¶30} But the trial court did not believe Rose. Instead, it found A.H. credible. It believed that Rose entered A.H.'s home without permission. It noted that Rose told

8

the children to go upstairs and believed she did so because Rose "wanted to fight." Nothing in the record compels us to disturb the trial court's findings.

### 3. The State disproved Rose's assertion that her use of force was necessary to repel the danger

**{¶31}** Another limitation to self-defense claims is that the defense is only available if "'"the force used to repel the danger was not more than the situation reasonably demanded."'" *State v. Johnson*, 2022-Ohio-2577, ¶ 15 (8th Dist.), quoting *Zafar*, 2020-Ohio-3341, at ¶ 52-53 (10th Dist.), quoting *State v. Johnson*, 2009-Ohio-3500, ¶ 12 (6th Dist.). Force used in self-defense "'"must be objectively necessary and reasonable under the facts and circumstances of the case and in view of the danger apprehended."'" *Id.,* quoting *Zafar* at ¶ 52, quoting *Johnson* at ¶ 12, and *Martin v. Cent. Ohio Transit Auth.*, 70 Ohio App.3d 83, 93 (10th Dist. 1990).

**{¶32}** A.H. testified that after Rose poked her in the eye and she touched Rose's hand, "that's when she started swinging." She also testified that Rose pinned her arms down during the fight. Rose, however, testified that she lives with severe pain in her knees due to osteoarthritis. She did not elaborate on the altercation outside of "we started fighting" and A.H. was "hitting and kicking me and some of everything."

**{¶33}** Despite Rose asserting that she had a large bruise on her abdomen from the fight, the trial court did not believe that A.H. had injured Rose at all. It noted that Rose had "beat up" the children's mother in front of the children. It also cited the size disparity between Rose and A.H., noting that Rose is "a lot bigger than [A.H.] . . . a lot bigger." It also did not believe that A.H. had smacked Rose's hand.

**{¶34}** The trial court's findings are supported by credible evidence.

### 4. The State disproved Rose's assertion that she did not violate a duty to retreat

**{¶35}** Finally, self-defense is not available to a defendant who violates a duty to retreat. *See State v. Avery*, 2023-Ohio-3570, ¶ 37 (5th Dist.). There is no duty to retreat if a "person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B). But there is a duty to retreat when the defendant is on another person's private property without privilege to be there. For instance, the defendant in *Avery* violated a duty to retreat after the victim "told Avery he was no longer welcome" on the victim's property and the defendant pulled out a gun instead of "simply leaving." *Avery* at ¶ 35 and 37. Even if he initially had the privilege to be on the victim's property, that "evaporated upon her clear revocation of that privilege." *Id*. at ¶ 35.

**{¶36}** Here, A.H. testified that Rose grabbed the door and forced her way into A.H.'s house. After A.H. grabbed Rose's hand, A.H. "grabbed [the] screen door and [] asked her to get out of [the] house." If her testimony is believed, then Rose had no lawful right to be in A.H.'s house. While Rose testified that A.H. had invited her into the house, she never refuted A.H.'s claim that A.H. later told her to leave.

### 5. The trial court's credibility determinations are supported by the evidence

**{¶37}** Rose argues that A.H.'s credibility is undermined by contradictory statements in A.H.'s testimony. According to Rose, A.H. contradicted her statement that A.H. opened the door and told Rose to leave after A.H. was poked in the eye. Rose points to A.H.'s testimony that Rose "started swinging on [A.H.]" after A.H. "touched [Rose's] hand to move it out of [her] face." But it is plausible that A.H. simultaneously grabbed Rose's hand and instructed her to leave. And the testimony cited by Rose is not as contradictory as she suggests. After being asked if she was "constantly in

contact" with Rose, A.H. testified that "once I touched her hand to move her, that's when she started swinging on me."

**{¶38}** Rose also argues that A.H.'s testimony lacks credibility because, according to Rose, A.H.'s testimony that Rose "kidnap[ped]" A.H.'s children is inconsistent with the fact that A.H. had asked Rose to babysit her children earlier in the day and was upset when Rose declined. But Rose and A.H. had just fought. While Rose testified that the two hugged and apologized immediately after the fight and A.H. gave Rose permission to take her children, Rose's testimony is inconsistent with A.H. initiating and assisting in Rose's prosecution.

**{¶39}** A.H.'s testimony, if believed, disproved multiple elements of Rose's self-defense claim. And the trial court unequivocally found that A.H. was credible, and that Rose was not. The trial court was able to observe Rose's and A.H.'s demeanors first-hand, and there is nothing in the trial transcript that warrants a departure from the trial court's credibility finding.

**{¶40}** The trial court did not lose its way when it found that the State disproved Rose's self-defense claim. We overrule the sole assignment of error.

### B. *The trial court's journal erroneously states that Rose pleaded guilty and was convicted by plea*

**{¶41}** Although not raised by either party, we found a clerical error in the journal and judge's sheet. The trial court's March 26, 2024 journal entry mistakenly states that Rose pleaded guilty. The docket also states that Rose was convicted by plea.

**{¶42}** The appropriate remedy for this clerical mistake is "a nunc pro tunc entry to reflect what actually occurred in open court." *State v. Bonnell*, 2014-Ohio-3177, ¶ 30; *see State v. Cooper,* 2019-Ohio-2813, ¶ 30 (1st Dist.). The trial court retains

jurisdiction to correct clerical mistakes in judgments and the record "arising from oversight or omission." Crim.R. 36.

### III.    Conclusion

**{¶43}** We overrule Rose's assignment of error, affirm her conviction, and remand the case to the trial court to correct its clerical error with a nunc pro tunc entry that reflects Rose's not-guilty plea and the fact that she was convicted by verdict.

Judgment affirmed and cause remanded.

**ZAYAS** and **BERGERON, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

12