[Cite as *State v. Greenawalt*, 2025-Ohio-4906.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

CHADWICK ALLEN GREENAWALT,
SR.,

    DEFENDANT-APPELLANT.

CASE NO. 9-24-40

OPINION AND
JUDGMENT ENTRY

Appeal from Marion County Common Pleas Court
Trial Court No. 22-CR-389

**Judgment Affirmed**

**Date of Decision:  October 27, 2025**

APPEARANCES:

    *April F. Campbell* **for Appellant**

    *Allison M. Kesler* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Chadwick Allen Greenawalt, Sr. ("Greenawalt") appeals the judgment of the Marion County Court of Common Pleas, arguing that (1) he was denied his right to the effective assistance of counsel; (2) the trial court should have given a self-defense instruction to the jury; (3) the trial court erred by permitting two witnesses to remain present in the courtroom for portions of the trial; (4) the trial court erred by not allowing the Defense to play recordings of a witness's prior inconsistent statements before the jurors; (5) his conviction for murder in violation of R.C. 2903.02(B) is not supported by sufficient evidence and is against the manifest weight of the evidence; and (6) the doctrine of cumulative error applies to this case. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Robert ("Robert") and Natalie ("Natalie") Rudd had a lot for their camper at the River Bend Campground in Marion County, Ohio. The Rudds' lot was across the street from where Bryan ("Bryan") and Shasta ("Shasta") McDole had a camper. In 2022, Bryan invited his friend, Greenawalt, to visit his campsite during the Fourth of July weekend.

{¶3} On July 2, 2022, Greenawalt went to the General Store at the River Bend Campground and purchased a day pass that permitted him to remain on the

premises until 11:00 P.M. He then rode his motorcycle to the McDoles' camper and parked his bike. Another camper, Randy Runyon ("Runyon"), testified that Greenawalt then pulled some bottles of an alcoholic beverage out of the bags on his motorcycle and began drinking with Bryan.

{¶4} Later that day, Greenawalt spent some time with Shasta's teenage nephews, S.M. and T.M. At some point, Greenawalt, S.M., and T.M. decided to have a footrace. S.M. and T.M. later testified that, while they were running, Greenawalt said that his knife fell out of his pocket. Another person, D.H., was present at this time and also reported hearing Greenawalt make this remark, though D.H. indicated that he never saw the knife that Greenawalt mentioned.

{¶5} T.M. and S.M.'s father had been friends with Greenawalt for a number of years. For this reason, T.M. had been around Greenawalt several times prior to this footrace. T.M. testified that Greenawalt regularly carried a pocketknife around because his job required use of such a tool. He stated that he had seen this pocketknife and that it had a clip.

{¶6} At around 3:00 P.M. on July 2, 2022, Robert and Natalie arrived at the campground with their family. They had planned to host a small gathering at their camper for the families on the neighboring lots. For this reason, Natalie set up a balloon arch as a decoration for the picnic while Robert prepared some food. After eating dinner, the Rudds went to a band performance on the campground with their friends, Roger ("Roger") and Kathy Morgan.

{¶7} Robert left the performance early to tend to the meat he was smoking for a cookout the following day. Robert had been assisted in this process by his friend, John Durbin ("Durbin"). After the band performance was over, Robert and Natalie were sitting outside of their camper with Roger; Durbin; Shasta; S.M.; and S.M.'s father, Richard Morgan ("Richard"). Bryan and Greenawalt drove up in a golf cart and joined this group of people sometime after 1:00 A.M. on July 3, 2022.

{¶8} At some point, Bryan popped one of the balloons on the decorative arch with a cigarette. After Greenawalt walked over to Bryan and began talking with him, another balloon was popped. Robert testified that these two were asked to leave because they were popping balloons and appeared to be intoxicated. Greenawalt and Bryan left the area but came back shortly thereafter. Robert testified that, after returning, Greenawalt popped another balloon.

{¶9} Multiple people then repeatedly asked him to leave. Robert affirmed that the "asking turn[ed] into telling" them to leave. (Tr. 485). He also stated that they asked so many times that they eventually "stop[ped] being polite about it." (Tr. 485). As Greenawalt walked away, another balloon was popped. Natalie then walked towards where Greenawalt was standing and said, "I want you guys off my lot. Get the h**l off of my lot. Just go, just go." (Tr. 937). Roger testified that he heard Greenawalt say, "Come on you p***y. Come on you punk b***h." (Tr. 939). He also heard Greenawalt say, "Come on, you piece of s**t." (Tr. 946).

-4-

{¶10} At this point, a physical altercation began between Greenawalt and Natalie. Robert and S.M. testified that Greenawalt turned around and struck Natalie first, hitting her in the face. Robert testified that, in this process, he heard Greenawalt tell Natalie, "F**k you b***h. I ain't got to go nowhere." (Tr. 487). However, Durbin testified that, from his vantage point, Natalie appeared to have swung at Greenawalt before he struck her. Similarly, Shasta and Richard stated that they saw Natalie strike Greenawalt first, hitting the back of his head.

{¶11} Robert then ran to the edge of his lot to separate them. He explained that he was attempting to "diffuse" the altercation but that Greenawalt "swung" at him. (Tr. 487). Durbin stated that Robert "took Chad [Greenawalt] to the ground." (Tr. 896). Richard, S.M., and Roger went down to the street to separate Robert and Greenawalt.

{¶12} Roger testified that, by the time he reached the brawl, Robert had Greenawalt pinned against the McDoles' picnic table. Roger grabbed Robert and pulled him away from Greenawalt. Richard screamed, "Stop, this is done, over with." (Tr. 1498). He then brought Greenawalt towards the McDoles' camper. After this initial altercation had concluded, Richard went to where his wife, Lindsey Morgan ("Lindsey"), was standing and explained what was happening.

{¶13} Durbin testified that Natalie and Robert were going to go back to their camper when Greenawalt yelled, "Come on B. Come on B." (Tr. 897). Durbin further stated that Greenawalt made this comment "[l]ouder than an adult roar" as

he "was walking over." (Tr. 897). He said that this "coaxed her [Natalie] to go back over." (Tr. 897).

{¶14} S.M. testified that, after the initial altercation concluded, Natalie gave him a hug and that, while they were hugging, Greenawalt "started to run at her . . . so she ran to him." (Tr. 742). He testified that Greenawalt yelled, "I'm going to kill those motherf***ers." (Tr. 762). S.M. testified that Greenawalt and Natalie then "ran towards each other" and "kind of met in the middle . . . ." (Tr. 579, 581).

{¶15} Robert testified that he saw Greenawalt "go after" Natalie and get "ahold of her" in front of the McDoles' camper. (Tr. 489). Robert stated that he got Greenawalt away from Natalie and put him into a headlock. Robert testified that, during this struggle, his knee was injured, and he fell onto the ground. As a result of this injury, Robert testified that he tried to get up but "couldn't walk on" his knee. (Tr. 544).

{¶16} S.M. testified that, as Greenawalt and Natalie struggled in front of the McDoles' camper, Natalie got pinned up against a lot sign before they moved towards the McDoles' picnic table. S.M. stated that, as Natalie and Greenawalt struggled, they moved towards the McDoles' picnic table. Eventually, Natalie was laying on the picnic table with Greenawalt above her.

{¶17} S.M. testified that he saw Greenawalt's arm going straight down as he was hitting Natalie while she was on the picnic table. Robert described Greenawalt's motions as "doing downward punches" as Natalie was "laying

perfectly flat" on the picnic table. (Tr. 493, 537). Richard testified that he saw Roger take Greenawalt to the ground. Grabbing Greenawalt, Roger yelled, "it's done, it's over with. Knock it the f**k off now." (Tr. 940).

**{¶18}** At this time, Durbin was helping Robert up and began walking with him to a nearby golf cart. After looking towards the picnic table, Robert saw Natalie lying on the ground and yelled, "that better not be my f**king wife." (Tr. 490). Durbin helped Robert sit down on the golf cart and then went to Natalie. Durbin testified that he heard Natalie take "three great big gasps of air" and initially thought that she had been "knocked out" or "was just unconscious." (Tr. 898).

**{¶19}** However, Lindsey could not detect a pulse and began performing CPR on Natalie while Richard dialed 9-1-1. Lindsey testified that, around this time, she heard Bryan tell Greenawalt, "I hear the cops. You might want to leave." (Tr. 1487). In response, Greenawalt got onto his motorcycle and left the scene of the altercation. Robert testified that, around this time, he heard someone say, "we need to get this cleaned up before they get here." (Tr. 546). Durbin testified that he saw people moving around the McDoles' lot and cleaning the campsite.

**{¶20}** Christopher O'Connor ("O'Connor") works as a paramedic at the First Consolidated Fire District and responded to the 9-1-1 call. When he arrived, Natalie was not responsive. As he offered medical care, O'Connor noticed a "penetrating mark" above Natalie's sternum, though her external bleeding appeared to be

"minimal." (Tr. 860, 865). The paramedics then transported Natalie to Marion General Hospital where she was pronounced dead.

{¶21} Shortly thereafter, law enforcement arrived at the scene. Lt. Eric White ("Lt. White") of the Marion County Sheriff's Office testified that he was responding to a reported assault and did not tape of the scene of the incident until he learned that Natalie had been pronounced dead at the hospital. A crowd of around fifty people was in the vicinity of the picnic table as law enforcement began to take witness statements.

{¶22} Deputy John Endicott ("Deputy Endicott") was also dispatched to the campground and was informed that a person connected to the reported assault had left the scene of the incident on a black motorcycle. On his way to the campground, Deputy Endicott saw Greenawalt on a motorcycle that matched the description of the report he had received and initiated a traffic stop. Deputy Endicott observed that Greenawalt had several injuries and detected the odor of an alcoholic beverage coming from his person.

{¶23} After he requested medical attention, Greenawalt was transported to Marion General Hospital where his injuries were treated. After he was arrested, law enforcement searched his person but did not locate any weapons. Roughly six to seven hours after the incident, a search warrant was approved that permitted law enforcement to obtain a blood sample from Greenawalt. Subsequent testing revealed that his blood alcohol level was 0.075.

{¶24} Natalie's remains were transported to Lucas County for an autopsy. Dr. Jeffrey Hudson ("Dr. Hudson") testified that the toxicology report indicated that Natalie's blood alcohol level was 0.13. He then identified a stab wound on her neck and a stab wound on her abdomen in addition to a cut on her arm. The characteristics of these wounds were consistent with having been struck by a sharp object, such as a blade or knife. He concluded that the stab wound below her neck was the fatal injury and was inflicted prior to the wounds on her abdomen and arm.

{¶25} Dr. Hudson testified that the object that created the neck injury went downward three inches into Natalie's body and transected her carotid artery. He stated that her carotid artery bled internally and that this wound would have caused her to lose consciousness within ten to twelve seconds. Further, since the neck wound was not jagged or surrounded by internal tissue bruising, he concluded this injury was not caused by contact with a blunt object or from being impaled.

{¶26} Detective Stacy McCurry of the Marion County Sheriff's Office conducted a search of the crime scene and did not locate a knife. Similarly, Detective Christy Utley did not locate a knife or any other weapons in the saddlebags of Greenawalt's motorcycle. During the investigation, law enforcement obtained security camera recordings from the General Store at the campground and found the footage of Greenawalt purchasing a day pass. In this recording, Greenawalt had a silver clip on his right pants pocket. Law enforcement did not

locate an item that resembled this clip in searching Greenawalt's person or in searching his motorcycle.

{¶27} On July 6, 2022, Greenawalt was indicted on two counts of murder in violation of R.C. 2903.02(B), unclassified felonies; two counts of involuntary manslaughter in violation of R.C. 2903.04(A), first-degree felonies; one count of voluntary manslaughter in violation of R.C. 2903.03(A), a first-degree felony; one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony; and one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony. The indictment identified the two counts of felonious assault as the predicate offenses for the two counts of murder in violation of R.C. 2903.02(B).

{¶28} A six-day jury trial on these charges began on June 10, 2024. The State called twenty-two witnesses to testify before the Defense called eleven witnesses. After the Defense rested, the trial court denied Greenawalt's Crim.R. 29 motion for acquittal and did not give a jury instruction on self-defense. On June 18, 2024, the jury returned verdicts of guilty on all seven counts against Greenawalt.

{¶29} On August 6, 2024, Greenawalt appeared for sentencing. After the trial court determined that the seven convictions were subject to merger, the State elected to proceed on the first count of murder in violation of R.C. 2903.02(B). The trial court ordered Greenawalt to serve a term of life imprisonment with the

possibility of parole after fifteen years and then issued its judgment entry of sentencing on August 9, 2024.

{¶30} Greenawalt filed his notice of appeal on August 19, 2024. On appeal, he raises the following seven assignments of error:

**First Assignment of Error**

**Trial Counsel were prejudicially ineffective because they abandoned Greenawalt's self-defense claim. Trial Counsel was prejudicially ineffective for failing to request a self-defense instruction, and for failing to argue it to the jury.**

**Second Assignment of Error**

**The trial court committed reversible error by failing to give Greenawalt a self-defense instruction. The State did have the burden to disprove self-defense. Greenawalt was not required to admit to committing the offenses to get this instruction.**

**Third Assignment of Error**

**The trial court committed reversible error by permitting the victim's husband to sit as the State's representative, during Greenawalt['s] trial over his objection. And by allowing [S.M.] to watch the remainder of the trial as a 'victim' under Evid.R. 615 and Greenawalt's right to a fair trial.**

**Fourth Assignment of Error**

**The trial court reversibly erred in not permitting the jury to hear the prior inconsistent statements of [S.M.]. He was the only witness who claimed Greenawalt threatened Natalie Rudd and the only witness who claimed he saw a knife during the affray.**

**Fifth Assignment of Error**

**The State's evidence that Greenawalt committed each offense [was] legally insufficient as a matter of law.**

**Sixth Assignment of Error**

**The evidence manifestly weighed against Greenawalt's convictions.**

**Seventh Assignment of Error**

**Greenawalt was denied his right to a fair trial through cumulative error.**

For the sake of clarity, we will consider the second assignment of error prior to the first assignment of error.

*Second Assignment of Error*

**{¶31}** Greenawalt argues that the trial court erred by failing to give a jury instruction on self-defense in this case.

Legal Standard

**{¶32}** "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 2014-Ohio-4767, ¶ 5. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240. However, "a trial court need not provide a requested jury instruction unless it finds that sufficient evidence was presented at trial to support giving the instruction." *State v. Stoychoff*, 2021-Ohio-4248, ¶ 9 (3d Dist.).

**{¶33}** "Self-defense is an affirmative defense whereby the defendant, in essence, admits to the facts of the state's case but offers additional facts that justify or excuse the defendant's use of force." *State v. Lewis*, 2025-Ohio-2178, ¶ 41 (6th Dist.). Under R.C. 2901.05, "a defendant claiming self-defense has the burden of production—that is, the burden of producing evidence that 'tends to support' his use of force in defending himself." *State v. Estelle*, 2021-Ohio-2636, ¶ 18 (3d Dist.). If the defendant carries this initial burden of production, the State must then carry the burden of persuasion and prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Grant*, 2023-Ohio-2720, ¶ 68 (3d Dist.).

**{¶34}** In deciding whether the defendant has carried this burden of production, "[t]he question is not whether the evidence should be believed but whether the evidence, if believed, could convince a trier of fact, beyond a reasonable doubt, that the defendant was acting in self-defense." *State v. Palmer*, 2024-Ohio-539, ¶ 21.

> Similarly to the standard for judging the sufficiency of the state's evidence, if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.

*State v. Messenger*, 2022-Ohio-4562, ¶ 25. The defendant's burden is "not a heavy one and . . . might even be satisfied through the state's own evidence." *Id*. at ¶ 22.

> 'Finally, a defendant's bare assertion that he acted in self-defense will be insufficient . . . . His assertions must be coupled with supporting

-13-

> evidence from whatever source and of a nature and quality sufficient
> to raise reasonable doubt as to guilt.'

(Citations omitted.) *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 20 (8th Dist.). "If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *State v. Miller*, 2025-Ohio-1920, ¶ 24 (4th Dist.), quoting *State v. Melchior*, 56 Ohio St.2d 15, 20 (1978).

{¶35} A defendant is entitled to a jury instruction on the use of deadly force in self-defense if he produced evidence that

> (1) he was not at fault in creating the situation that led to the affray,
> (2) he had a 'bona fide belief' that he was 'in imminent danger of death or great bodily harm' and his only way to escape was by using force, and (3) he did not violate a duty to retreat.

*Palmer* at ¶ 23, quoting *Messenger* at ¶ 14. *See State v. Bender*, 2024-Ohio-1750, ¶ 21 (3d Dist.) (noting that the act of stabbing another person will generally constitute the use of deadly force). "The elements of self-defense are cumulative; the defendant's failure to show legally sufficient evidence raising an issue on any of the elements warrants the refusal of a self-defense instruction." *State v. Brennan*, 2024-Ohio-4687, ¶ 63 (5th Dist.).

{¶36} As to the first element for self-defense, the "concept [of being at fault] is broader than simply not being the immediate aggressor." *Bender* at ¶ 27, quoting *State v. Elam*, 2022-Ohio-1895, ¶ 14 (12th Dist.). The person at fault "can be the first to use force or the person whose 'wrongful' behavior provoked the assault."

*State v. Rose*, 2024-Ohio-5689, ¶ 28 (1st Dist.). "In other words, 'a defendant voluntarily participating in or initiating a confrontation, especially for purposes other than protection, cannot justify or excuse' her use of force." *Id.*, quoting *State v. Smith*, 2021-Ohio-1185, ¶ 23 (8th Dist.). *See also State v. Fields*, 2025-Ohio-2248, ¶ 21 (1st Dist.).

{¶37} As a result, "a person cannot provoke a fight or voluntarily enter combat and then claim self-defense." *State v. Canankamp*, 2023-Ohio-43, ¶ 38 (3d Dist.), quoting *State v. James*, 2021-Ohio-1112, ¶ 21 (2d Dist.). Further, a person "cannot claim self-defense when he 'willingly advanced toward a volatile situation' by confronting the victim to continue an earlier altercation[.]" *State v. Warth*, 2023-Ohio-3641, ¶ 43 (1st Dist.), quoting *State v. Sekic*, 2011-Ohio-3978, ¶ 15 (8th Dist.). *See also State v. Smith*, 2024-Ohio-2811, ¶ 12 (8th Dist.) (concluding a defendant was at fault where the evidence suggested that "no violence would have ensued" if he had not willingly "advanced toward and confronted the victim").

{¶38} "The second element of self-defense in a deadly force scenario requires both a subjective belief of imminent danger and an objectively reasonable basis for that belief." *State v. Smiley*, 2025-Ohio-2666, ¶ 38 (5th Dist.).

> The trier of fact 'first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, []he *reasonably* believed []he was in imminent danger.' . . . 'Then, if the objective standard is met, the [trier of fact] must determine if,

subjectively, this particular defendant had an honest belief that []he was in imminent danger.'

(Citations omitted.) (Brackets and emphasis sic.) *State v. Patterson*, 2025-Ohio-280, ¶ 42 (10th Dist.), quoting *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997).

> Implicit in the second element of self-defense is the requirement that the degree of force used was warranted under the circumstances and proportionate to the perceived threat. *State v. Kean*, 2019-Ohio-1171, ¶ 58 (10th Dist.). As to the degree of force that is permitted, the defendant is privileged to use the amount of force that is reasonably necessary to repel the attack. *State v. Williford*, 49 Ohio St.3d 247 (1990). In other words, one may use a commensurate amount of force as the circumstances require to protect oneself against an attack.

*Smiley* at ¶ 41. "If the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *Grant*, 2023-Ohio-1305, at ¶ 70 (3d Dist.), quoting *State v. Barker*, 2022-Ohio-3756, ¶ 27 (2d Dist.). Further, "[w]hen an imminent threat has ceased, self-defensive actions become unreasonable." *State v. Brown*, 2025-Ohio-2351, ¶ 26 (1st Dist.).

{¶39} Finally, as to the third element, R.C. 2901.09(B) now specifies that "[a] person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be." This "stand your ground" provision "removes, in most cases, the duty to retreat before using self-defense." *Bender*, 2024-Ohio-1750, at ¶ 66 (3d Dist.), quoting *State v. Degahson*, 2022-Ohio-2972, ¶ 15 (2d Dist.).

-16-

Standard of Review

**{¶40}** A "trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction." *State v. Fulmer*, 2008-Ohio-936, ¶ 72. For this reason, appellate courts examine whether a trial court's decision not to give a requested jury instruction was an abuse of discretion given the circumstances of the case. *Grant*, 2023-Ohio-2720, at ¶ 65 (3d Dist.).

**{¶41}** An abuse of discretion is not merely an error of judgment but is present where a decision is arbitrary, unreasonable, or unconscionable. *State v. Sullivan*, 2017-Ohio-8937, ¶ 20 (3d Dist.). "If the evidence adduced at trial is legally insufficient to raise the issue of self-defense, the court is not obligated to instruct the jury regarding this claim and has discretion to completely remove it from the jury's consideration." *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist. 1993).

Legal Analysis

**{¶42}** Greenawalt raises two main arguments herein. First, he asserts that the evidence produced at trial was sufficient to entitle him to a jury instruction on self-defense. Turning to the first element of self-defense, we will examine whether evidence was produced at trial from which the jurors could have found that Greenawalt was not at fault in creating the altercation in which deadly force was employed against Natalie.

{¶43} The evidence produced at trial indicates that two physical altercations occurred in the early morning of July 3, 2022. The initial altercation began soon after Greenawalt returned to the Rudds' lot. Greenawalt had previously been asked to leave the Rudds' lot because he had been popping the balloons on Natalie's decorative arch. The testimony at trial indicates that, after Greenawalt returned, he began engaging in the behavior that had previously prompted the Rudds to ask him to leave. Multiple witnesses testified that the Rudds and several others present asked Greenawalt to leave because of this behavior.

{¶44} Natalie eventually approached Greenawalt at the edge of her lot and loudly asked him to leave her property. In response, he told her, "f**k you, you p***y b***h. You p***y, come on." (Tr. 960). While the witnesses gave conflicting testimony about whether Natalie or Greenawalt used physical force first, the initial altercation between Robert, Natalie, and Greenawalt concluded when Roger and Richard managed to separate these individuals.

{¶45} S.M. affirmed that the scene remained calm for around three minutes. He testified that Natalie gave him a hug and that Greenawalt "started to run at her while [they were] . . . hugging . . . so she ran to him." (Tr. 742). S.M. stated that Greenawalt yelled, "I'm going to kill these mother***ers." (Tr. 762). He then affirmed that Greenawalt went "after her [Natalie]" and said that "he [Greenawalt] started running and she [Natalie] started running. . . . They both ran towards each other" and "kind of met in the middle." (Tr. 581, 579).

**{¶46}** Similarly, Durbin testified that, at this point, Robert was going to take Natalie back to their camper when Greenawalt said, "Come on B. Come on B." (Tr. 897). These statements were "directed at Natalie" and made "[l]ouder than an adult roar or a yell." (Tr. 898). Durbin indicated that Greenawalt yelled these statements "as he was walking over" and that this comment "coaxed her to go back over." (Tr. 897). Robert also testified that Greenawalt "went back after Natalie again for the second time." (Tr. 489). This second altercation ended when Greenawalt was pulled away from Natalie at the picnic table moments before she was unconscious on the ground.

**{¶47}** In addressing these facts on appeal, Greenawalt makes much of the conflicting testimony as to whether he or Natalie resorted to physical force first during the initial altercation. As a preliminary matter, we note that, in the lead-up to the physical struggle, Greenawalt returned to the Rudds' lot; persisted in the behavior that he had been told to stop during his prior visit; did not initially respond to repeated requests for him to leave from multiple people after he returned to their lot; and insulted Natalie with profanity. *See Warth*, 2023-Ohio-3641, at ¶ 43 (1st Dist.), citing *State v. Gaston*, 2013-Ohio-2331, ¶ 16-17 (8th Dist.).

**{¶48}** But even more relevant to this analysis, the evidence at trial indicates that this initial altercation ended when Roger and Richard intervened and separated the parties. At this point, Robert and Natalie had withdrawn from the dispute and were going to go back to their camper. The State produced evidence that, after the

-19-

initial altercation concluded, Greenawalt then began to scream insults at Natalie while advancing in her direction and that this conduct led to the altercation in which he used deadly force. *See State v. Walker*, 2021-Ohio-2037, ¶ 19 (8th Dist.) ("Generally, a defendant, having willingly advanced toward a volatile situation cannot rely on the affirmative defense of self-defense."). *See also Fields*, 2025-Ohio-2248, at ¶ 21 (1st Dist.).

{¶49} In response, the Defense did not present any evidence that would suggest that, after the initial altercation ended, Robert or Natalie undertook any actions that evinced an intention to threaten Greenawalt or to rekindle the physical altercation. As noted previously, "'a defendant voluntarily participating in or initiating a confrontation, especially for purposes other than protection, cannot justify or excuse' her use of force." *Rose*, 2024-Ohio-5689, at ¶ 28 (1st Dist.), quoting *Smith*, 2021-Ohio-1185, at ¶ 23 (8th Dist.). Having reviewed the evidence in the record, we conclude that the Defense did not produce sufficient evidence to raise an issue as to the first element of self-defense.

{¶50} While Greenawalt's failure to substantiate the first element of self-defense is sufficient to conclude that a jury instruction was properly denied, we note that the Defense also did not produce evidence that indicates Greenawalt "had a 'bona fide belief' that he was 'in imminent danger of death or great bodily harm' and his only way to escape was by using force[.]" *Palmer*, 2024-Ohio-539, at ¶ 23,

quoting *Messenger*, 2022-Ohio-4562, at ¶ 14. *See also Brennan*, 2024-Ohio-4687, at ¶ 63 (5th Dist.).

**{¶51}** The testimony at trial indicates that Natalie sustained the fatal wound while she was lying flat against a picnic table with Greenawalt above her. At this point, Robert had suffered a knee injury and required assistance to walk. For this reason, he was not near the picnic table and was not part of the physical altercation. The record contains no indication that Natalie—or any other person present—was, at this point, in a position to place Greenawalt in danger of death or great bodily harm.

**{¶52}** Further, Robert testified that he saw Greenawalt make a stabbing motion three times while above Natalie. Similarly, the State introduced a recording of the 9-1-1 call that Richard and Lindsey had placed on July 3, 2022. The dispatcher testified that a person on the call reported that Greenawalt had hit Natalie three times.

**{¶53}** Dr. Hudson also testified that he identified three wounds on Natalie's body. Based on the condition of these wounds, Dr. Hudson concluded that the wounds on her abdomen and arm were inflicted *after* Natalie had already been stabbed in the neck. He also concluded that Natalie's internal bleeding would have likely caused her to lose consciousness within ten to twelve seconds of sustaining her neck injury.

{¶54} Dr. Hudson's testimony also indicates that Natalie was struck below her neck with a sharp object that created a wound that was three inches deep. This "stab wound to the neck" was consistent with "some kind of blade or knife." (Tr. 1397, 1400). *State v. Ray*, 2013-Ohio-3671, ¶ 32 (12th Dist.) (finding self-defense inapplicable where the defendant "used deadly force" by stabbing the victim in the supraclavicular region with a hunting knife" because the defendant "was not faced with deadly force, only fists").

{¶55} Having examined the evidence in the record, we conclude that the Defense did not produce evidence from which a finder of fact could conclude that Greenawalt had a bona fide belief that he was in imminent danger of death or great bodily harm at the time Natalie sustained the fatal wound. Since Greenawalt did not produce sufficient evidence to raise self-defense, the trial court did not abuse its discretion in refusing to give a jury instruction on self-defense.[1]

{¶56} Second, Greenawalt argues that he did not need to admit to stabbing Natalie in order to receive a self-defense jury instruction. At trial, the main strategy of the Defense was to argue that the State could not establish that Natalie's fatal wound was inflicted by Greenawalt. *See State v. Oates*, 2013-Ohio-2609, ¶ 13 (3d Dist.). In particular, the Defense emphasized that no knife was located in the

---

[1] The State also argues that the third element of self-defense was not substantiated because the day pass that Greenawalt purchased at the campground permitted him to be on the premises until 11:00 P.M. on July 2, 2022. Since the brawl occurred after midnight on July 3, 2022, the State asserts that Greenawalt was not lawfully present on the campground at the time of the altercation. As we have already found the first two elements were not supported by sufficient evidence, we do not address this argument.

investigation. The Defense also suggested that Natalie could have sustained the fatal injury from contact with the bolt on the lot sign or a nearby piece of rebar during the brawl.

{¶57} In response, the State argued that Greenawalt had not produced sufficient evidence to raise self-defense or even acknowledged that he committed the act that caused Natalie's death. However, even if Greenawalt had admitted to stabbing Natalie in the neck, the evidence produced at trial was still not sufficient to warrant a jury instruction on self-defense. For this reason, we need not—and do not—make a determination regarding this second argument.

{¶58} In conclusion, Greenawalt failed to produce evidence at trial that was sufficient to create an issue as to each of the elements of self-defense and, as a result, failed to raise this affirmative defense. For this reason, Greenawalt's arguments fail to establish that the trial court abused its discretion when it did not give a jury instruction on self-defense in this case. Accordingly, the second assignment of error is overruled.

*First Assignment of Error*

{¶59} Greenawalt argues that he was denied his right to the effective assistance of counsel when his trial counsel withdrew the request for a self-defense instruction.

Legal Standard

**{¶60}** "Ohio law presumes that a licensed attorney's representation was competent." *State v. Morgan*, 2024-Ohio-625, ¶ 13 (3d Dist.). "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 2018-Ohio-3618, ¶ 24 (3d Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**{¶61}** To establish deficient performance, the appellant must demonstrate that defense "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 2017-Ohio-4349, ¶ 35 (3d Dist.), quoting *Strickland* at 687. In general, matters that fall within the ambit of trial strategy or debatable tactics do not constitute ineffective assistance of counsel. *State v. Wears*, 2023-Ohio-4363, ¶ 32 (3d Dist.). Further, defense counsel is not required to "raise meritless issues or even all arguably meritorious issues." *State v. Mayse*, 2017-Ohio-1483, ¶ 24 (3d Dist.).

**{¶62}** To establish prejudice, "the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Bibbs*, 2016-Ohio-8396, ¶ 13 (3d Dist.). "If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test." *State v. Gear*, 2023-Ohio-1246, ¶ 50 (3d Dist.).

Legal Analysis

{¶63} On appeal, Greenawalt argues that his defense attorneys were ineffective for abandoning a strategy based upon self-defense and withdrawing the request for a jury instruction on self-defense. However, in the second assignment of error, we concluded that the evidence produced at trial was not sufficient to entitle Greenawalt to a self-defense instruction. The failure to make a futile request does not constitute deficient performance. *See Grant*, 2023-Ohio-2720, at ¶ 97 (3d Dist.); *State v. May*, 2015-Ohio-4275, ¶ 35 (8th Dist.).

{¶64} Further, the Defense sought to raise doubts about whether Greenawalt was the cause of the fatal wound that Natalie suffered. Given the lack of support for a self-defense instruction, the decision to pursue this alternative defense was a reasonable trial strategy. For these reasons, we conclude that Greenawalt has failed to establish that he was deprived of his right to the effective assistance of counsel. Accordingly, his first assignment of error is overruled.

*Third Assignment of Error*

{¶65} Greenawalt argues that the trial court incorrectly concluded that Robert and S.M. were victims within the meaning of Marsy's Law and erred in finding that they had a right to be present in the courtroom after they had testified as witnesses.

-25-

Legal Standard

{¶66} In 2017, the Ohio Constitution was amended when the voters approved a provision known as "Marsy's Law." This provision was designed to "give[] crime victims and their families meaningful and enforceable rights . . . ." *In re J.G.*, 2021-Ohio-1624, ¶ 50 (3d Dist.). Marsy's Law defines a victim

> a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act. The term 'victim' does not include the accused or a person whom the court finds would not act in the best interests of a deceased, incompetent, minor, or incapacitated victim.

Ohio Const., Art. I, § 10a(D). A person who qualifies as a "victim" has the right, "upon request, to reasonable and timely notice of all public proceedings involving the criminal offense . . . against the victim, and to be present at all such proceedings[.]" Ohio Const., Art. I, § 10a(A)(2).

{¶67} "While the Marsy's Law now incorporates a victim's right to be present at all public proceedings involving a criminal offense into the Ohio Constitution, the notion that a victim may remain present during the trial proceedings is not new." *Cleveland v. Alrefaei*, 2020-Ohio-5009, ¶ 57 (8th Dist.). Prior to the passage of Marsy's law, Evid.R. 615 and R.C. 2930.09 addressed the victim's right to be present at trial. *See State v. Marshall*, 2009-Ohio-2197, ¶ 41-43 (12th Dist.). These provisions were revised after the passage of Marsy's Law and "provide . . . guidance in reviewing . . . [a] trial court's denial of . . . [a defendant's] request to exclude the alleged victims from . . . trial." *Alrefaei* at ¶ 57.

{¶68} Evid.R. 615 addresses the separation and exclusion of witnesses at trial and reads, in its relevant part, as follows:

(A) Except as provided in division (B) of this rule, at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. An order directing the 'exclusion' or 'separation' of witnesses or the like, in general terms without specification of other or additional limitations, is effective only to require the exclusion of witnesses from the hearing during the testimony of other witnesses.

(B) This rule does not authorize exclusion of any of the following persons from the hearing:

. . .

(4) In a criminal proceeding, a victim of the charged offense to the extent that the victim's presence is authorized by statute enacted by the General Assembly or by the Ohio Constitution. As used in this rule, 'victim' has the same meaning as provided in Chapter 2930 of the Revised Code.

"The obvious purpose of an order excluding a witness from a courtroom is to prevent a witness from shaping or fabricating his testimony to conform to testimony previously given." *State v. Navarro*, 2025-Ohio-227, ¶ 40 (3d Dist.), quoting *State v. Jones*, 1980 WL 351056, * 8 (4th Dist. July 14, 1980).

### Standard of Review

{¶69} "Issues surrounding the separation of witnesses . . . are within the sound discretion of the trial court." *Navarro* at ¶ 41. *See State v. McConnaughey*, 2021-Ohio-3320, ¶ 26 (1st Dist.) (the issue of whether to permit a victim to be present in the courtroom during a trial is generally committed to the trial court's

discretion). "The burden is on the defendant to show the presence of the alleged victim compromised the defendant's right to a fair trial." *Alrefai*, 2020-Ohio-5009, at ¶ 60. *See also State v. Pennington*, 2024-Ohio-5681, ¶ 67 (4th Dist.).

Legal Analysis

{¶70} Greenawalt raises two main arguments herein. First, he asserts that the trial court erred by failing to enforce the order separating the witnesses at trial. In this case, the Defense objected when Robert sought to remain in the courtroom once he had finished testifying. The Defense then argued that Robert needed to be excluded from the proceeding because he could potentially be called to testify again later in the trial. Another objection was raised on the same grounds when S.M. entered the courtroom after he testified.

{¶71} After both of these objections, the State argued that, as family members of the decedent, S.M. and Robert were victims within the meaning of Marsy's Law and had a right to be present at the proceeding.[2] After hearing the arguments of the parties, the trial court concluded that Robert and S.M. had a right to remain in the courtroom. On appeal, Greenawalt argues that Natalie's family members were not necessarily victims under Marsy's Law and that the trial court's failure to enforce the separation order deprived him of a fair trial.

---

[2] Robert was Natalie's husband, and S.M.'s mother was Natalie's first cousin.

{¶72} However, the record contains no indication that Robert or S.M. were present in the courtroom prior to testifying as witnesses during the State's case-in-chief. At the beginning of trial, the State told the trial judge that no witnesses that the prosecution intended to call were present in the courtroom. Once the Defense objected to Robert's presence, the trial court noted that he "was out of the courtroom prior to his testimony." (Tr. 555). Similarly, when the Defense objected to S.M. entering the courtroom after he testified, the trial court inquired into whether he could begin to assert any of the rights that he might have as a victim that far in the proceeding. Further, neither Robert nor S.M. were subsequently called to testify during the remainder of the trial.

{¶73} As noted previously, "[t]he purpose of separating witnesses is to prevent them from hearing the testimony of other witnesses and tailoring their testimony accordingly." *State v. Kelley*, 2023-Ohio-3972, ¶ 30 (8th Dist.), quoting *State v. Stroud*, 2023-Ohio-569, ¶ 41 (11th Dist.). In this case, Robert and S.M. could not have tailored their testimony in this manner because neither of them took the stand after hearing any of the other witnesses speak at trial.

{¶74} Because of the timeframes in which these two witnesses were in the courtroom, Greenawalt cannot establish that their presence interfered with the protections offered by a separation order or affected the fairness of his trial. Thus, even if the trial court incorrectly found that Robert and S.M. were victims under Marsy's Law, any resulting error is harmless. For this reason, we do not need to

decide whether these two witnesses qualified as victims under the Ohio Constitution to resolve this issue and make no determination on this matter. Since Greenawalt has failed to demonstrate prejudice, his first argument is without merit.

{¶75} Second, Greenawalt asserts that Robert was permitted to sit at counsel's table with the prosecutor as the State's representative. In *State v. Montgomery*, the Ohio Supreme Court found that "permitting the alleged victim to sit at the prosecutor's table during the criminal trial and to be designated and introduced to the jury as the state's representative" constituted structural error. *Id.*, 2022-Ohio-2211, ¶ 33. We turn to determining whether the record establishes that Robert did, in fact, sit at the counsel's table as the State's representative at trial.

{¶76} At the beginning of voir dire and at the beginning of trial, the county prosecutor stated the names of the two other people who were sitting with him at counsel's table. Joining him were an assistant county prosecutor and a detective from the sheriff's office. *See State v. Wilburn*, 2023-Ohio-4865, ¶ 67 (4th Dist.). These were the only occasions at trial where those who were sitting alongside the prosecutor at counsel's table were expressly identified. In contrast to *Montgomery*, neither the trial court nor the prosecutor ever referred to Robert as the State's representative in front of the jurors. *Id.,* 2022-Ohio-2211, at ¶ 19, 36.

{¶77} In the absence of a statement formally designating Robert as the State's representative or expressly indicating that he was sitting at counsel's table,

Greenawalt points to the following portion of an exchange that occurred after the

Defense objected to Robert remaining in the courtroom:

> [Defense Counsel]: I was just saying, and I'm checking with my office, but if we have Mr. [Robert] Rudd subpoenaed, we would ask the separation of witnesses remain. . . .
>
> . . .
>
> [Prosecutor]: I don't know if he's been served or not. What I do know is pursuant to Marsy's Law, he's the victim. *So as a matter of fact, I think there was recently a case where the victim was allowed to sit at counsel table.* So we would ask, given the Constitutional protections he has, that he be allowed to sit.
>
> [Defense Counsel]: And if I may briefly respond, Your Honor, given the Constitutional argument that was raised. I believe that the Constitution requires that a member of the victim's family be present—or allows for a member of the victim's family be present, of which, there are numerous. And I would also note he was not in the courtroom up to this point. So if he was going—if the allegation was going to be that he had a Constitutional right to be here, he would have never been separated by the State to begin with.
>
> . . .
>
> [Defense Counsel]: . . . I am empathetic to the situation that there's to be a representative from the family. You can't march in 50 different people and then claim . . . the entire family are victims . . . . I think there are other members of the family present to satisfy the Constitutional requirement that the victim's family be allowed to be present.
>
> [Trial Court]: I'm not aware of anything in Marsy's Law that says you can pick one representative.
>
> [Defense Counsel]: I don't think it says that either. I think it's to allow a member of the family—as [the prosecutor] . . . stated, a member of the family sat at counsel table. They did not have the entire family.

> [Prosecutor]: *No, I think that case it was the actual sexual assault victim who sat at counsel table.*
>
> . . . .
>
> [Defense Counsel]: . . . I think he just has to be removed to insure the sanctity of the proceedings. . . .
>
> [Trial Court]: . . . [A]ren't you basically arguing that Mr. Rudd, if *he's allowed to stay in the courtroom* and you do call him, which is an if, and then if he changes his testimony based on what he heard from other witnesses, then he may have—the Defendant may have his right to a fair trial compromised if those things all happen.

(Emphasis added.) (Tr. 549-551, 555). In this exchange, the prosecutor appears to have been unfamiliar with the current law on this subject, but the context of his statements suggests he was arguing that, if a trial court had permitted a victim to sit at counsel's table after testifying as a witness in another case, then it was assuredly permissible for the trial court to permit Robert to remain in the room after testifying as a witness in this case.[3]

{¶78} While another case in which a trial court had permitted the "actual sexual assault victim . . . [to] s[i]t at counsel table" was referenced, the trial court and the Defense did not respond by discussing the propriety of allowing *Robert* to sit at counsel's table. (Tr. 551). Rather, the Defense discussed the "requirement

---

[3] The prosecutor was correct that another trial court had permitted a sexual assault victim to sit at counsel's table as the State's representative. *State v. Montgomery*, 2019-Ohio-5178, ¶ 24 (5th Dist.). However, on appeal, the Ohio Supreme Court found that designating the victim as the State's representative and permitting her to sit at counsel's table constituted structural error in a decision released on June 30, 2022. *Montgomery*, 2022-Ohio-2211, at ¶ 33. Thus, the prosecutor appears to have been unaware of how this situation was ultimately handled by the Ohio Supreme Court.

that the victim's family be allowed to be present." (Tr. 551). These arguments expressly addressed who could represent the family in the courtroom but did not address who could represent the State at counsel's table in this case.

{¶79} The content of this sidebar establishes that Robert was, in the words of the trial court, "allowed to stay in the courtroom." (Tr. 551). The evidence in the record does not establish that Robert was sitting as the State's representative at counsel's table. Based on the evidence contained in the record currently before us, we cannot determine that the structural error identified in *Montgomery* occurred in this case. *Id.*, 2022-Ohio-2211, at ¶ 33. For this reason, Greenawalt's second argument herein is without merit. Accordingly, the third assignment of error is overruled.

*Fourth Assignment of Error*

{¶80} Greenawalt argues that he should have been permitted to introduce extrinsic evidence of S.M.'s prior inconsistent statements at trial.

Legal Standard

{¶81} "Evid.R. 613 governs impeachment by self-contradiction." *State v. Dodridge*, 2025-Ohio-2856, ¶ 45 (4th Dist.). Evid.R. 613(B) reads as follows:

> (B) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
>
> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to

interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

When seeking to admit extrinsic evidence of a prior inconsistent statement, the relevant party must lay a foundation in which:

(1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement.

*State v. Mack*, 73 Ohio St.3d 502, 514-515 (1995), quoting *State v. Theuring*, 46 Ohio App.3d 152, 155 (1st Dist. 1988).

**{¶82}** "If a witness denies making a prior inconsistent statement, a proper foundation has been laid, and if, in addition, the prior inconsistent statement does not relate to a collateral matter, extrinsic evidence is admissible." *State v. Ollison,* 2016-Ohio-8269, ¶ 60 (10th Dist.), quoting *State v. Ferguson*, 2013-Ohio-4798, ¶ 15 (10th Dist.). *See also State v. Greene*, 2024-Ohio-35, ¶ 44 (12th Dist.). "[H]owever, when a witness admits making a prior statement, it is not an abuse of discretion for the trial court to exclude extrinsic evidence of the statement." *State*

-34-

*v. Edwards*, 2025-Ohio-641, ¶ 40 (8th Dist.). *See State v. Pierce*, 2011-Ohio-4873, ¶ 82 (2d Dist.) (Where the prior inconsistent statement is admitted, "there is no need for extrinsic evidence.").

Standard of Review

**{¶83}** Appellate courts apply an abuse of discretion standard when reviewing a trial court's decision to admit or exclude extrinsic evidence subject to Evid.R. 613(B). *Greene* at ¶ 45. "An abuse of discretion is more than an error in judgment but is present where the trial court made a decision that was arbitrary, unreasonable, or unconscionable." *State v. Yemsvat*, 2025-Ohio-1971, ¶ 6 (3d Dist.). In applying this standard, "an appellate court is not to substitute its judgment for that of the trial court." *State v. Richey*, 2021-Ohio-1461, ¶ 40 (3d Dist.).

Legal Analysis

**{¶84}** At trial, S.M. indicated that he sat for a police interview on July 6, 2022 when he was fourteen years old. On cross-examination, the Defense confronted S.M. with a series of statements that he made during the police interview that were inconsistent with his testimony on direct examination. S.M. then admitted to making a series of prior inconsistent statements. The trial judge said, "All the answers that I heard he [S.M.] acknowledged that his statements prior were inconsistent." (Tr. 737). On appeal, Greenawalt essentially argues that the recording of S.M. should have been admitted regardless of whether S.M. admitted to making these inconsistent statements in front of the jury.

-35-

{¶85} However, this Court and our sister districts have held that a trial court does not abuse its discretion by excluding extrinsic evidence of a prior inconsistent statement where a witness admits to having made that statement. *State v. Osborne*, 1988 WL 91322, *6 (3d Dist. Sept. 1 1988); *State v. Shook*, 2014-Ohio-3987, ¶ 52 (3d Dist.); *State v. Green*, 2023-Ohio-4360, ¶ 72 (3d Dist.). *See also State v. Harrison*, 2022-Ohio-4627, ¶ 22 (2d Dist.); *Dodridge*, 2025-Ohio-2856, at ¶ 46-48 (4th Dist.); *State v. West*, 2017-Ohio-4055, ¶ 69 (5th Dist.); *State v. Spaulding*, 2017-Ohio-7993, ¶ 16 (6th Dist.); *Edwards*, 2025-Ohio-641, at ¶ 40 (8th Dist.); *City of Columbus v. Flowers*, 2019-Ohio-5205, ¶ 20 (10th Dist.); *Greene*, 2024-Ohio-35, at ¶ 44 (12th Dist.).

{¶86} Given the precedent of our district regarding the admissibility of extrinsic evidence pursuant to Evid.R. 613(B), Greenawalt's argument does not establish that the trial court abused its discretion in excluding the recording of the police interview after finding that S.M. had admitted to making these prior inconsistent statements. Accordingly, the fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶87} Greenawalt argues that his conviction for murder in violation of R.C. 2903.02(B) is not supported by sufficient evidence.

Legal Standard

{¶88} A sufficiency-of-the-evidence analysis examines whether the State has carried its burden of production at trial. *Richey*, 2021-Ohio-1461, at ¶ 16 (3d

-36-

Dist.). "On review, an appellate court is not to consider whether the evidence at trial should be believed but whether the evidence, if believed, could provide a legal basis for the finder of fact to conclude that the defendant is guilty of the crime charged." *State v. Daniels*, 2024-Ohio-1536, ¶ 13 (3d Dist.).

> Accordingly, the applicable standard 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.'

*State v. Reed*, 2024-Ohio-4838, ¶ 30 (3d Dist.), quoting *State v. Plott*, 2017-Ohio-38, ¶ 62 (3d Dist.).

{¶89} Ohio's felony-murder statute is contained in R.C. 2903.02(B). *State v. Nolan*, 2014-Ohio-4800, ¶ 8. Pursuant to this provision, the State must prove that the defendant "cause[d] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Thus, to establish a violation of R.C. 2903.02(B), the State must prove that the defendant committed a qualifying predicate offense that proximately caused the victim's death. *State v. Scott*, 2024-Ohio-5595, ¶ 12 (2d Dist.).

{¶90} In turn, the crime of felonious assault is listed as an offense of violence in R.C. 2903.11.[4] To establish that a person committed felonious assault in violation

---

[4] After Greenawalt's convictions merged at sentencing, the State elected to proceed on the first count of murder in violation of R.C. 2903.02(B). The State listed felonious assault in violation of R.C. 2903.11(A)(1) as the predicate offense for the first count of murder in the indictment.

of R.C. 2903.11(A)(1) as a second-degree felony, the State must prove that the defendant "knowingly . . . [c]ause[d] serious physical harm to another . . . ." *See* R.C. 2903.11(D)(1)(a). Notably, "[t]he felony-murder statute imposes what is in essence strict liability. Though intent to commit the predicate felony is required, intent to kill is not." *Nolan* at ¶ 9.

Legal Analysis

{¶91} On appeal, Greenawalt raises two main arguments that assert the State failed to produce sufficient evidence that he committed the act that caused Natalie's death. First, he argues that Natalie came into contact with several blunt objects during the brawl that could have potentially caused the fatal wound. At trial, the Defense pointed out that Natalie was pushed up against a lot sign that had a bolt protruding outward and was near a flowerpot that was broken during the fight.

{¶92} At trial, Dr. Hudson identified three wounds to Natalie that were located on her abdomen, her arm, and near her neck. In speaking of these injuries, he noted that these were "sharp force" injuries that appeared to be caused by "some kind of blade or knife." (Tr. 1397). Similarly, he noted that the "V-shape" of the injury on Natalie's arm indicated that this was "an incised wound made by a sharp instrument." (Tr. 1399).

{¶93} Dr. Hudson also testified that the stab wound near Natalie's neck transected her carotid artery and was the fatal injury. He concluded that the injury near Natalie's neck was around three inches deep and was made with a sharp object,

"like a knife." (Tr. 1400). He also stated that fatal wound was accompanied by "traveling abrasions . . . [o]r superficial incised wounds caused by withdrawing of the knife." (Tr. 1402). While Dr. Hudson could not be "100 percent" sure that the instrument that created this injury was a knife, he emphasized that "[i]t ha[d] to be a sharp object" to create the type of internal injuries that he observed. (Tr. 1406, 1426).

{¶94} At trial, the prosecutor asked about whether contact with a bolt or rebar could cause an injury with these characteristics. In response, Dr. Hudson indicated that contact with those types of objects would result in "blunt force or impaling type[s] of injuries." (Tr. 1409). He testified that, if Natalie had been impaled by an object, the entrance wound would have been jagged; the outside of the wound would have been surrounded by abrasions; she would have had internal tissue bruising; and the damage to the arteries would have been irregular or crushed rather sharply incised.

{¶95} While the police investigation did not recover a knife, three witnesses—T.M., S.M., and D.H.—testified that they heard Greenawalt say that his knife had fallen out of his pocket during a footrace on the evening of July 2, 2022. While T.M. and D.H. stated that they did not actually see the knife that was mentioned, T.M. stated that he saw Greenawalt picking something up. S.M. testified that he saw the knife in Greenawalt's hands and watched him put it into a golf cart.

{¶96} T.M. also testified that he knew Greenawalt because his father had been friends with Greenawalt for years. T.M. stated that Greenawalt's job involved constructing pools and that he, for this reason, regularly carried a knife in his pocket. T.M. further testified that he had previously seen Greenawalt's pocketknife and noticed that it had a clip. The State introduced footage from a security camera at the campground in which a silver clip was visible on Greenawalt's right pants pocket. However, law enforcement did not locate an item with such a clip when searching Greenawalt or his motorcycle.

{¶97} The trial testimony also establishes that Greenawalt left the scene of the incident on his motorcycle before law enforcement arrived and was apprehended some distance from the campground. A reasonable trier of fact could conclude from this evidence that Natalie's fatal wound was not caused by blunt-force contact with a bolt or similar object during the brawl. Thus, we conclude that this first argument is without merit.

{¶98} Second, Greenawalt argues that, since none of the witnesses testified that they saw him stab Natalie with a sharp instrument, the State did not produce evidence that establishes he inflicted the fatal wound on her neck. As an initial matter, we note that the prosecution was not required to produce eyewitness testimony to establish that Greenawalt caused the fatal wound in this case. *See State v. Turks*, 2009-Ohio-1837, ¶ 31 (3d Dist.). To the contrary,

[a] conviction can be obtained solely based on circumstantial evidence. . . . '[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others.'

(Citation omitted.) *State v. Boyd*, 2025-Ohio-984, ¶ 37 (2d Dist.), quoting *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988).

**{¶99}** Turning to the evidence presented at trial, Dr. Hudson stated that the fatal wound near Natalie's neck transected her carotid artery and led to significant internal bleeding. Importantly, Dr. Hudson concluded that, based on the amount of internal bleeding from her carotid artery and the coloration of her other organs, Natalie would have likely lost consciousness within ten to twelve seconds of sustaining this fatal wound. He also indicated that condition of the three main wounds on Natalie's body indicated the fatal wound on her neck was inflicted before the injuries on her abdomen and arm.

**{¶100}** Robert testified that, towards the end of the altercation, he observed Natalie lying flat on the McDoles' picnic table with Greenawalt "on top of her." (Tr. 537). Robert testified that he saw Greenawalt making a "downward" punching motion three times. (Tr. 494). S.M. similarly testified that he saw Greenawalt making "a stabbing motion" at Natalie while she was on the picnic table. (Tr. 580). S.M. stated that the fight was then broken up by Roger.

-41-

{¶101} Similarly, Richard testified that Roger pulled Greenawalt "to the ground . . . [r]ight up by the picnic table" just as he noticed that Natalie was lying on the ground. (Tr. 1502). At this time, Durbin went over to Natalie and believed that she "was knocked out" or "just unconscious." (Tr. 898). He testified that he heard Natalie make three big gasps of air before Lindsey indicated that Natalie did not have a pulse.

{¶102} Since Dr. Hudson's expert opinion indicates that Natalie lost consciousness within ten to twelve seconds of being stabbed in the neck, Robert, Durbin, and S.M.'s testimony establishes that Greenawalt was above Natalie at the picnic table and making downward motions towards her during the timeframe in which she sustained the fatal wound. A reasonable trier of fact could infer from this evidence that Greenawalt inflicted the fatal wound. Thus, we conclude that this second argument is without merit.

{¶103} Having viewed the evidence in a light most favorable to the State, we conclude that Greenawalt's arguments have failed to establish that his conviction for murder in violation of R.C. 2903.02(B) was not supported by sufficient evidence. Accordingly, the fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶104} Greenawalt argues that his conviction for felony murder in violation of R.C. 2903.02(B) is against the manifest weight of the evidence.

Legal Standard

**{¶105}** "A manifest-weight analysis examines whether the State has carried

its burden of persuasion at trial." *State v. Carroll*, 2024-Ohio-1626, ¶ 58 (3d Dist.).

On review, "an appellate court's function . . . is to determine whether the greater

amount of credible evidence supports the verdict." *State v. Harvey*, 2020-Ohio-329,

¶ 12 (3d Dist.), quoting *Plott* at ¶ 73.

> Appellate courts "must review the entire record, weigh the evidence
> and all of the reasonable inferences, consider the credibility of
> witnesses, and determine whether in resolving conflicts in the
> evidence, the factfinder 'clearly lost its way and created such a
> manifest miscarriage of justice that the conviction must be reversed
> and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *State*

*v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

Legal Analysis

**{¶106}** Greenawalt raises three main arguments to establish that his

convictions are against the manifest weight of the evidence. First, he argues that

the weight of the evidence does not support the conclusion that he caused Natalie's

death by stabbing her with a sharp instrument. At trial, the Defense emphasized the

fact that no knife was discovered during the police investigation. Further, Durbin,

Richard, Shasta, and Bryan testified that they did not see Greenawalt with a weapon

on the night of the incident. While T.M. testified that Greenawalt regularly carried

a knife, Bryan testified that he had known Greenawalt for a number of years but did not know him to carry a knife.

{¶107} However, D.H., S.M., and T.M. each testified that, earlier that evening, they heard Greenawalt state that his pocketknife had fallen out of his pocket during a footrace. While D.H. and T.M. did not see Greenawalt's knife, T.M. did see Greenawalt bend over to pick up something. S.M. further testified that, at the time of the footrace, he saw a pocketknife in Greenawalt's hands and saw him put it into a nearby golf cart.

{¶108} On cross-examination, S.M. did admit to making several prior inconsistent statements about the knife during his interview with law enforcement. S.M. had previously indicated to law enforcement that he did not see the knife after Greenawalt mentioned dropping it during the footrace. Further, on direct examination, he indicated that the knife was in Greenawalt's pocket, but he had previously reported to law enforcement that he did not see a knife during the altercation.

{¶109} In addressing the absence of a knife at the scene, the State pointed out that Greenawalt had left the campground on his motorcycle as several bystanders were rendering aid to Natalie; that people were moving around the campsite in a panic after the incident; and that Lt. White had testified that the crime scene was not secured until after Natalie had been pronounced dead.

{¶110} The Defense also suggested that the fatal wound may have been caused at some other point of the altercation by Natalie's contact with a blunt object. S.M. testified that Natalie was pinned up against a sign that had a bolt protruding from its surface. Bryan also testified that a flowerpot in front of his camper appeared to have been damaged during the altercation.

{¶111} However, Dr. Hudson testified that the fatal injury was caused by a sharp, blade-like object. On cross-examination, he admitted that he could not be one hundred percent sure that Natalie was stabbed with a knife. But he discounted the possibility of Natalie having been impaled because wounds received in such a manner are jagged and surrounded by tissue bruising. For this reason, he concluded that her injury was not likely caused by blunt-force contact with a bolt or another similar object.

{¶112} The Defense also emphasized that a number of the witnesses had difficulty discerning what was transpiring at different points of this altercation. During his testimony, Roger pointed out that the incident occurred at night while the lights at the nearby camper were out and that this affected the visibility of the incident. However, Robert, Richard, and S.M. testified that they were still able to see that Greenawalt was at the picnic table with Natalie just before she fell to the ground.

{¶113} Robert and S.M. also indicated that Greenawalt was making striking motions at Natalie at this point. The medical examiner testified that Natalie would

have lost consciousness within ten to twelve seconds after receiving the stab wound near her neck. As noted previously, the evidence produced by the State establishes that Greenawalt was making punching or stabbing motions at Natalie in the relevant timeframe. Having reviewed the evidence in the record, we conclude that this first argument does not establish that Greenawalt's conviction is against the manifest weight of the evidence.

{¶114} Second, Greenawalt argues that S.M. provided the most incriminating account of what transpired but was shown on cross-examination to have given multiple inconsistent statements about the incident. At trial, the prosecution called six witnesses who observed portions of the altercation between Greenawalt and Natalie. Importantly, S.M. was not the only witness who placed Greenawalt over Natalie at the picnic table just before she lost consciousness and fell to the ground. He was also one of three witnesses who heard Greenawalt mention that he had a knife during the footrace on July 2, 2022. Thus, these two critical portions of S.M.'s testimony were cumulative to other trial testimony.

{¶115} In this case, the jurors were presented with S.M.'s testimony on direct examination and heard him admit to making multiple, prior inconsistent statements on cross-examination. The jurors, as the finders of fact, were free to believe all, some, or none of the testimony produced by the State at trial. *State v. Reed*, 2024-Ohio-4838, ¶ 48 (3d Dist.). For this reason, "[a] determination that a witness is not credible on review is insufficient to reverse a verdict based on the manifest-weight

standard." *State v. Schulman*, 2020-Ohio-4146, ¶ 56 (3d Dist.). Having reviewed the relevant evidence, we conclude that this second argument does not establish that Greenawalt's conviction is against the manifest weight of the evidence.

{¶116} Third, Greenawalt argues that self-defense offered a better explanation for what transpired than the theory presented by the State at trial. At trial, the State produced evidence that suggested Greenawalt was impaired at the time that he went to the Rudds' lot and popped the balloons on Natalie's arch. Robert testified that, at the time of the altercations, Greenawalt had been drinking with Bryan; was stumbling as he walked; and had slurred speech.

{¶117} In response, the Defense argued that subsequent testing indicated that his blood alcohol level of 0.075 was below the legal limit for driving, but the State pointed out that the warrant authorizing law enforcement to take a blood sample from Greenawalt was not approved until six or seven hours after the incident. The Defense also pointed out that Natalie had a blood alcohol level of 0.13.

{¶118} While they were in this condition, Natalie approached Greenawalt and told him to leave her property, leading to a physical altercation that lasted until Richard and Roger separated the parties. The State argued that, across these events, Greenawalt grew increasingly angry at Natalie and sought to retaliate against her. The prosecution presented evidence that the Rudds were going to go back to their camper when Greenawalt yelled insults at Natalie and advanced towards them.

{¶119} Further, S.M. affirmed that he saw Greenawalt "go running at Natalie" after making this remark. S.M. testified that, at this point, he heard Greenawalt yell, "I am going to kill those motherf**kers." (Tr. 579). On cross-examination, S.M. did admit that he had not previously told law enforcement about hearing Greenawalt make this comment. But Robert, S.M., and Durbin described Greenawalt as advancing towards Natalie while screaming profanity at her.

{¶120} In response to this testimony, the Defense did not present any evidence that suggested Robert or Natalie engaged in actions that were provocative, threatening, or otherwise evinced an intention to rekindle the altercation. Robert testified that Greenawalt eventually had Natalie up against the picnic table and made a downward, stabbing motion at her three times before she fell to the ground. After Natalie was unconscious on the ground, Greenawalt got onto his motorcycle and fled the scene of the incident.

{¶121} While Greenawalt argues that self-defense is a better explanation for his actions than the State's theory of the case, we have already concluded under the second assignment of error that the evidence produced at trial was not sufficient to support a jury instruction on self-defense. In other words, the evidence presented at trial could not be reasonably interpreted such that self-defense could provide a cogent explanation for Greenawalt's use of deadly force against Natalie.

{¶122} Having examined the evidence in the record, we conclude that the State's theory of the case is not against the manifest weight of the evidence. *State*

*v. Adkins*, 2020-Ohio-1618, ¶ 80 (8th Dist.) (A conviction is not against the manifest weight of the evidence "merely because the jury found the state's version of the events to be more believable than appellant's theory of the case."). For this reason, Greenawalt's third argument is without merit. The record contains no indication that the jurors lost their way and returned a verdict that was against the manifest weight of the evidence. Accordingly, the sixth assignment of error is overruled.

*Seventh Assignment of Error*

{¶123} Greenawalt argues that the alleged errors he has identified in this appeal had the cumulative effect of denying him a fair trial.

Legal Standard

{¶124} "The cumulative-error doctrine provides that 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. Belton*, 2016-Ohio-1581, ¶ 169, quoting *State v. Powell*, 2012-Ohio-2577, ¶ 223. "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *In re J.M.*, 2012-Ohio-1467, ¶ 36 (3d Dist.).

Legal Analysis

{¶125} Greenawalt argues that the alleged errors he identified in his prior six assignments of error provide a basis for his conviction to be reversed pursuant to

the doctrine of plain error. However, we have already determined that the arguments in these prior assignments of error are without merit. Since Greenawalt has not identified any errors that were committed at his trial, he has failed to demonstrate cumulative error. *State v. Lewis*, 2020-Ohio-6894, ¶ 91 (3d Dist.). Accordingly, the seventh assignment of error is overruled.

*Conclusion*

**{¶126}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Marion County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

Case No. 9-24-40

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

John R. Willamowski, Judge

William R. Zimmerman, Judge

Mark C. Miller, Judge

DATED:
/hls